George F. **RILEY**, individually and as the Trustee of the George F. Riley Business Trust Dated April 17, 1997, Plaintiffs/Counter–Defendants,

v.

**AMERITECH CORPORATION, INC.,** a foreign corporation and Ameritech CT Acquisition Corporation, a foreign corporation, Defendants/Counter–Plaintiffs,

and

Ameritech Corporation, Inc., and Ameritch CT Acquisition Corporation, Third Party Plaintiffs,

v.

**Follmer Rudzewicz PLC,** a Michigan corp., Third Party Defendant.

No. 00–71920.

United States District Court, E.D. Michigan, Southern Division.

May 21, 2001.

Joseph Falcone, Brian H. Rolfe, Joseph Falcone Assoc., Southfield, MI, for George F. Riley, individually and as the Trustee of the George F. Riley Business Trust Dated April 17, 1997, plaintiffs.

Albert Calille, Ameritech, Detroit, Ryan P. Stiles, Altheimer & Gray, Chicago, IL, for Ameritech Corporation, Incorporated, Ameritech CT Acquisition Corporation, defendants.

Rodger D. Young, Terry Wuester Milne, J. David Garcia, Young & Susser, P.C., Southfield, MI, for Follmer Rudzewicz, PLC, third-party defendant.

## ORDER GRANTING IN PART, AND DENYING IN PART, COUNTER–DEFENDANT'S MOTION TO DIS-MISS

ROBERTS, District Judge.

### I. Introduction

Pending before the Court is the Motion to Dismiss filed by Third–Party Defendant Follmer Rudzewicz PLC ("FRC"), an accounting firm. FRC seeks dismissal of the December 11, 2000 Counterclaims that Ameritech Corporation and Ameritech CT Acquisition Corporation (collectively, "Ameritech") filed against FRC. Those Counterclaims pertain to the accounting services FRC provided to Clover Technologies, Inc. ("Clover") prior to the Plaintiff George F. Riley's sale of Clover to Ameritech. Counts I and II of Ameritech's Counterclaims are filed in its capacity as an assignee of Clover. Count I alleges accounting malpractice and Count II alleges breach of contract. Count III is another claim for accounting malpractice, but is based upon alleged duties that FRC owed directly to Ameritech. In Count IV, which alleges breach of contract, Ameritech contends that it was a third-party beneficiary of agreements between Clover and FRC.

For the reasons stated below, the Court will not dismiss Counts I and II, but will dismiss Counts III and IV.

### II. Background

Ameritech's Counterclaims begin with the following summary of its allegations against FRC:

1. This action arises out of the failure of the accounting firm of [FRC] to provide services complying with applicable professional standards. As a result of FRC's inferior work, the financial statements of [Clover] for the periods ending June 30, 1997, and June 30, 1998 and October 6, 1998 were materially misleading by among other things, overstating Clover's revenues, current assets and net income by millions of dollars.

2. FRC's failure to meet applicable professional standards had two prin-

cipal effects. First, because of FRC's errors and omissions, Clover operated with a mistaken view of its own financial condition. While FRC assured Clover it was a profitable, growing business, Clover in fact was in deep financial trouble during these time periods. Because FRC did not alert Clover to its true financial condition, Clover incurred additional losses, and greater debt and other liabilities than it otherwise would have. Counts I and II of this Counterclaim are brought by [Ameritech] as assignee of Clover, and seek damages incurred by Clover proximately caused by FRC's misconduct.

3. Second, FRC's failure to comply with applicable professional standards and assure that Clover's financial condition was fairly and accurately presented misled Ameritech CT, which purchased 100% of the stock of Clover in the fall of 1998, and its parent, Ameritech Corporation, which has invested millions of dollars in Clover since the date of purchase.... Had FRC assured that the financial condition of Clover was accurately presented, Ameritech CT would not have purchased Clover, would have paid a significantly reduced price for Clover or, at a minimum, would not have invested or had Ameritech Corporations invest so much money in Clover in a futile attempt to turn the company around. Counts III and IV of this Counterclaim are brought by [Ameritech] for the damages they have suffered because of FRC's professional misconduct.

Ameritech uses the remainder of its 67 paragraph Counterclaim to fill in the details of the above allegations.

A principal issue raised in the Motion to Dismiss is: To what extent did FRC direct its services to and/or conduct its services on behalf of Ameritech? The Counterclaims clearly allege that Clover understood the importance of FRC's audits and financial reviews to Ameritech. For example, Ameritech asserts, "Recognizing the importance of the 1997 Review to [Ameritech's] valuation of Clover, the Seller Parties included the 1997 Review as an attached schedule to the Agreement." (Counterclaims at ¶ 19). In its Response to FRC's Motion to Dismiss, Ameritech claims that the 1997 Reviews were provided to it "with FRC's full knowledge and consent." (Ameritech Br. at 4). However, the Counterclaims' allegations do not say that.

Ameritech additionally claims that the "Seller Parties provided [Ameritech] with the [June 30, 1998] audited financial statements of Clover." (Counterclaims at ¶ 25). A "1998 Compilation" was also performed by FRC in October 1998. Ameritech objected to portions of the 1998 Compilation and FRC attempted to resolve the disputes. (Counterclaims at ¶¶ 28, 31–32). According to the Counterclaims, Ameritech alleges that "FRC was informed in writing at the time of the engagement for the 1998 Audit and/or the 1998 Compilation that a primary intent of Clover was for the professional accounting services rendered to benefit or influence [Ameritech]." (Counterclaims at ¶ 57). Further, "FRC knew that the 1998 Audit and the 1998 Compilation would be relied upon by [Ameritech]." (Counterclaims at ¶ 65).

Significantly, however, there are no allegations that FRC intended that its work be for the benefit of Ameritech. For example, when FRC attempted to resolve the disputes regarding the 1998 Compilation, its efforts were performed "on behalf of the Seller Parties ...." (Counterclaim at

31). Ameritech, moreover, alleges that FRC actively participated with Clover's owners to deceive Ameritech.

> It was in the interest of the Seller Parties to inflate the current assets and value of Clover in the financial statements presented in the 1998 Compilation so that any purchase price adjustments would be minimized. On information and belief, FRC was aware of these objectives of the Seller Parties, and worked with the Seller Parties to maximize those objectives.

(Counterclaims at ¶ 29).

## III. Arguments, Applicable Law and Analysis

Ameritech's Motion is filed pursuant to Fed.R.Civ.P. 12(b)(6). When reviewing a Rule 12(b)(6) Motion, the trial court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir.1994); *see also Miller v. Currie*, 50 F.3d 373, 377 (6th Cir.1995). Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses." *Miller*, 50 F.3d at 377. The court should deny a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Gazette*, 41 F.3d at 1064; *see also Miller*, 50 F.3d at 377; *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir.1994). While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993). Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *DeLorean*, 991 F.2d at 1240.

### A. Count I, Accounting Malpractice

The accounting malpractice claim alleged in Count I is asserted by Ameritech in its capacity as an assignee of Clover. In it's motion to dismiss Count I, FRC relies upon the well settled Michigan law providing that attorney malpractice actions may not be assigned. It argues that, like the attorney-client relationship, the accountant-client relationship is of a personal nature. Additionally, Michigan law recognizes a broad accountant-client privilege. Finally, if this Court held that an accounting malpractice claim may be assigned. It would be contrary to the restrictive policy of the Accountant Liability Act.

In response, Ameritech reminds the Court that the general rule is to allow assignment of all legitimate causes of action. Ameritech contends the case law prohibiting assignment of legal malpractice action is inapposite. Instead, Ameritech relies upon opinions out of Florida and Indiana as support for its argument that accounting malpractice claims are distinguishable from legal malpractice claims.

### 1. Applicable Law and Analysis

*Clover's* ability to sue FRC for accountant malpractice is not in doubt. What is at issue is Ameritech's ability to stand in the shoes of Clover. The Accountant Liability Act, M.C.L. § 600.2962 states:

> This section applies to an action for professional malpractice against a certified public accountant. A certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant only in 1 of the following situations:
>
> (a) A negligent act, omission, decision, or other conduct or the certified public

accountant if the claimant is the certified public accountant's client.

(b) An act, omission, decision, or conduct of the certified public accountant that constitutes fraud or an intentional misrepresentation.

(c) A negligent act, omission, decision, or other conduct of the certified public accountant if the certified public accountant was informed in writing by the client at the time of engagement that a primary intent of the client was for the professional public accounting services to benefit or influence the person bringing the action for civil damages. For the purposes of this subdivision, the certified public accountant shall identify in writing to the client each person, generic group, or class description that the certified public accountant intends to have rely on the services. The certified public accountant may be held liable only to each identified person, generic group, or class description. The certified public accountant's written identification shall include each person, generic group, or class description identified by the client as being benefited or influenced.

 There are no cases analyzing whether accounting malpractice claims are assignable under Michigan law. The general rule under Michigan law is that "all legitimate causes of action are assignable." *Grand Traverse Convention and Visitor's Bureau v. Park Place Motor Inn, Inc.,* 176 Mich.App. 445, 448, 440 N.W.2d 28 (1989). However, a well settled exception to this general rule provides that attorney malpractice claims are not assignable. This exception is relied upon by FRC.

In *Joos v. Drillock,* 127 Mich.App. 99, 338 N.W.2d 736 (1983), the court followed other jurisdictions to hold that legal malpractice claims are unassignable. To so hold, the court cited with approval the reasoning of *Goodley v. Wank & Wank,*

*Inc.,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976). As reported by Joos, the *Goodley* court relied upon the " 'uniquely personal nature of legal services and the contract out of which a highly personal and confidential attorney-client relationship arises.' " *Joos* at 103, 338 N.W.2d 736, *quoting Goodley* at 395, 133 Cal.Rptr. 83. *Joos* further quoted with approval the *Goodley* court's reasoning that legal malpractice claims could become marketplace commodities if they were held to be assignable:

'The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and

fiduciary relationship existing between attorney and client.

\* \* \* [T]he ever present threat of assignment and the possibility that ultimately the attorney may be confronted with the necessity of defending himself against the assignee of an irresponsible client who, because of dissatisfaction with legal services rendered and out of resentment and/or for monetary gain, has discounted a purported claim for malpractice by assigning the same, would most surely result in a selective process for carefully choosing clients thereby rendering a disservice to the public and the profession.'

*Joos* at 103–104, 338 N.W.2d 736, *quoting Goodley* at 397–398, 133 Cal.Rptr. 83.

*Joos* also cited *Christison v. Jones*, 83 Ill.App.3d 334, 39 Ill.Dec. 560, 405 N.E.2d 8 (1980). Like *Goodley*, the *Christison* court held that legal malpractice actions should not be assignable because of the personal nature of the attorney-client relationship.

The *Joos* court concluded by holding:

In view of the personal nature of the attorney-client relationship and the public policy considerations discussed above, we conclude that a legal malpractice cause of action is not subject to assignment.

*Joos* at 105, 338 N.W.2d 736.

Subsequent to *Joos*, the Supreme Court of Indiana held attorney malpractice claims to be non-assignable. *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338 (Ind.1991). *Picadilly* provides an example of the type of commercialization of legal malpractice claims that courts have attempted to prevent.

In that case, Charles Colvin was injured by a drunk driver who had been a patron of Picadilly's bar. Colvin sued Picadilly, and a jury awarded Colvin compensatory and punitive damages. Subsequently, Picadilly sued its attorneys for legal malpractice, but the court granted summary judgment in favor of the attorneys. Picadilly filed for bankruptcy reorganization and, as a consequence, Colvin's punitive damage claim was discharged. In exchange, Picadilly assigned its legal malpractice claim to Colvin's attorney. Thus, the attorney for Colvin, who had previously argued that Colvin was entitled to punitive damages due to Picadilly's negligence, was now arguing to the contrary; now the attorney was arguing that Colvin would not have been awarded the punitive damages but for the negligence of Picadilly's attorneys. This change of position was one factor that led the *Picadilly* court to hold that the assignment of legal malpractice claims would bring disrepute to the legal profession.

Because of the unique nature of the trial within a trial, Colvin's change in position would be obvious to all the jurors hearing the evidence in Picadilly II. They would rightly leave the courtroom with less regard for the law and the legal profession than they had when they entered.

*Picadilly* at 345.

Furthermore, the *Picadilly* court found the assignment of legal malpractice claims most incompatible with the duty of loyalty an attorney owes to his/her client.

An attorney's loyalty is likely to be weakened by the knowledge that a client can sell off a malpractice claim, particularly if an adversary can buy it. If an attorney is providing zealous representation to a client, the client's adversary will likely be motivated to strike back at the attorney in any permissible fashion. If an adversary can retaliate by buying up a client's malpractice action, attorneys will begin to rethink the wisdom of zealous advocacy. A legal system that

discourages loyalty to the client, disserves that client. While attorneys probably remain protected from their client's opponents as long as they please their client, even happy client relationships have been known to spawn malpractice claims.

*Picadilly* at 342.

An attorney's duty to maintain confidences would also be at risk if legal malpractice claims were held to be assignable. If an attorney is being sued, he/she is permitted to reveal confidential information that is necessary to his/her defense. The client can control the scope of the disclosure by, if necessary, dropping the suit. But, if the claim is assigned, the client loses such control. *Picadilly* at 343.

However, despite its decisions in *Christison* and *Picadilly* to rely upon, the Illinois appeals court declined to follow them and carve out yet another exception to the general rule that causes of action can be assigned.

In *First Community Bank and Trust v. Kelley,. Hardesty, Smith and Co., Inc.*, 663 N.E.2d 218 (Ind.App.1996), the Indiana Court of Appeals held accounting malpractice claims are assignable. The plaintiffs in *First Community Bank* were a group of bank directors who had purchased non-performing loans from the bank and accepted an assignment of the bank's interest in causes of action relating to the loans. The plaintiffs filed a malpractice action against the auditor of the bank. In reliance upon *Picadilly,* the trial court granted summary judgment in favor of the auditor, holding that the malpractice claim was not assignable.

In reversing the trial court, the *First Community Bank* court noted, "An accountant, though imposed with a duty of loyalty to clients, is not an 'advocate' for clients in an adversarial system." *First Community* at 221. The court further

distinguished the facts of *Picadilly* from those before it. Whereas the assignee in Picadilly was a former adversary.

> The Directors were successors in interest to the Bank on the notes that they purchased from the Bank. When they bought the notes, they stood in the position of the Bank. Thus, the interest acquired with the notes included the claim for malpractice with regard to the audit of the notes.

*Id.*

Finally, the *First Community Bank* court reasoned that the concerns regarding commercialization and the disreputable effect on the legal system relied upon in *Picadilly* were not present with respect to the assignment of accountant malpractice claims. *Id.* at 222–223.

In accord with *First Community Bank,* the court in *National Union Fire Ins. Co. of Pittsburgh, Pa. v. KPMG Peat Marwick,* 742 So.2d 328 (Fla.App. 3 Dist.1999), *aff'd KPMG Peat Marwick v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 765 So.2d 36 (Fla.2000), held that accounting malpractice claims are assignable. The court reasoned that the accountant-client privilege is not recognized at common-law and that the accountant-client relationship was not the close, highly confidential relationship that gave rise to the rule forbidding assignment of legal malpractice claims. *Id.* at 330.

Neither party has presented any opinions from any jurisdictions which hold that accounting malpractice actions cannot be assigned.

The Court notes that Michigan has a statute defining the accountant-client privilege:

(1) Except by written permission of the client or the heir, successor, or personal representative of the client to whom the

information pertains, a licensee, or a person employed by a licensee, shall not disclose or divulge and shall not be required to disclose or divulge information relative to and in connection with an examination or audit of, or report on, books, records, or accounts that the licensee or a person employed by the licensee was employed to make. Except as otherwise provided in this section, the information derived from or as the result of professional service rendered by a certified public accountant is confidential and privileged.

(2) Subsection (1) does not prohibit a certified public accountant whose professional competence has been challenged in a court of law or before an administrative agency from disclosing information otherwise confidential and privileged as part of a defense in the court action or administrative hearing.

(3) Subsection (1) does not prohibit the disclosure of information required to be disclosed in the course of practice monitoring programs and ethical investigations conducted by a licensed certified public accountant. In such cases, the information disclosed to another licensed certified public accountant in the course of practice monitoring programs and ethical investigations is confidential and privileged to the same degree and in the same manner as provided for in subsection (1).

M.C.L. § 339.732.

■ As in Indiana and Florida, Michigan's common law does not recognize an accountant-client privilege. "Because this accountant-client privilege is in derogation of the common law, it is strictly construed, and the scope of the privilege is subject to a number of limitations and restrictions." *People v. Simon,* 174 Mich.App. 649, 658, 436 N.W.2d 695 (1989)(referring to M.C.L.

§ 339.713, which was superseded by § 339.732).

■ Based on the foregoing survey of pertinent cases, this Court declines to hold that accountant malpractice actions cannot be assigned under Michigan law.

■ In this case, as in *First Community Bank,* the alleged assignee is a successor of interest. Ameritech purchased Clover. As such, Ameritech should have been privy to the confidential accounting information regarding Clover that FRC provided. Indeed, according to Ameritech's Counterclaims, FRC was aware that Ameritech was provided with the 1998 Audit and 1998 Compilation, and FRC participated in attempts to resolve Ameritech's objections to the Compilation. Consequently, FRC's claim that it is being forced to defend itself against a stranger to the Clover–FRC relationship is inconsistent with both Ameritech's role as the purchaser of Clover and with the allegations of the Counterclaims.

Furthermore, although Michigan's statutory privilege of accounting information is broad, it is not grounded in the same or similar duty of loyalty underlying the attorney-client privilege. The *First Community Bank* court noted, "An accountant, though imposed with a duty of loyalty to clients, is not an 'advocate' for clients in an adversarial system." *First Community Bank* at 221. Similarly, in *People v. Paasche,* 207 Mich.App. 698, 525 N.W.2d 914 (1994), the court contrasted the attorney-client privilege with that of the accountant-client. It quoted *United States v. Zolin,* 491 U.S. 554, 562–563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), describing the attorney-client privileges as being a result of " 'the centrality of open client and attorney communication to the proper functioning of our adversary system of justice ....' " *Paasche* at 705, 525 N.W.2d 914. In contrast, the court described the

more limited purpose of the accountant-client relationship as follows: "to protect from disclosure the substance of the information conveyed by the client to the accountant." *Id.* at 706, 525 N.W.2d 914.

The *First Community Bank* court additionally noted that in Indiana, unlike the attorney-client privilege, the accountant-client privilege is purely a statutory creation. Under Indiana law, privileges that were not recognized under common law are disfavored and, therefore, strictly construed. *Id.* at 221–222. Likewise, Michigan's common law does not recognize an accountant-client privilege. "Because this accountant-client privilege is in derogation of the common law, it is strictly construed, and the scope of the privilege is subject to a number of limitations and restrictions." *People v. Simon,* 174 Mich.App. 649, 658, 436 N.W.2d 695 (1989)(referring to M.C.L. § 339.713, which was superseded by § 339.732).

 FRC further argues that allowing the assignment of Clover's accounting malpractice claim would violate the restrictive policy evident in Michigan's Accountant Liability Act. It is true that M.C.L. § 600.2962 allows negligence suits only by clients or by those whom the client and the accountant identify in writing.[1] However, nothing in § 2962 prevents the client from assigning its legitimate cause of action consistently with the general rule. Unlike a third-party beneficiary type action, an assignment such as the one asserted in this case is based solely on the duty the accountant owed to his/her client. Thus, allowing the assignment claim in this case would not expand FRC's liability beyond that anticipated by § 2962.

 Finally, even if the Court were to find that Michigan courts would prohibit the assignment of accounting malpractice cases, it certainly would decline to retroactively apply that finding to bar Ameritech's claim. In *Moorhouse v. Ambassador Ins. Co., Inc.,* 147 Mich.App. 412, 412, 383 N.W.2d 219 (1985), the court held that "Joos applies only to assignments of legal malpractice claims made after its release date of July 11, 1983." While the general rule in Michigan is that appellate decisions are given full retroactivity, "[r]etroactive application of a decision may be withheld entirely where it would have a harsh effect because of reliance upon the old rule." *Id.* The *Moorhouse* court opined that retroactive application of the Joos holding would have a harsh effect. "[T]here was nothing about the law of assignments generally or assignments of legal malpractice claims in particular which would have forewarned plaintiffs that the Joos exception was forthcoming." *Id.* at 421–422, 383 N.W.2d 219.

In this case, parties such as Ameritech have had no reason to expect that the Joos rule would be applied to accounting malpractice actions. *Moorhouse* identified Joos as carving out a narrow exception to the general rule allowing assignment of all legitimate actions, and, as described above, the accountant-client relationship is distinguishable from the attorney-client relationship. The distinctions have been noted in the only published opinions on the issue. Both of those opinions held accounting malpractice claims to be assignable. Thus, a holding that Clover's alleged assignment of its accounting malpractice claim to Ameritech was invalid would have an unreasonably harsh effect.

---

1. Otherwise, § 1405 requires the claimant to allege fraud or intentional misrepresenta-tion—claims not made by Ameritech.

For all the foregoing reasons, the Court will deny FRC's Motion to Dismiss with respect to Count I of the Counterclaims.

### B. *Count II, Breach of Contract*

The breach of contract claim cited in Count II is also filed by Ameritech in its capacity as an assignee of Clover. In its motion to dismiss. FRC argues that the substance of Ameritech's claim is one for malpractice, and since malpractice actions cannot be assigned, Count II should be dismissed. FRC further argues that a breach of contract claim cannot be sustained here, because Ameritech does not allege a "special agreement" between the parties.

In response, Ameritech argues that the courts in *Ohio Farmers Ins. Co. v. Shamie*, 235 Mich.App. 417, 597 N.W.2d 553 (1999), and *Yadlosky v. Grant Thornton, L.L.P.*, 120 F.Supp.2d 622 (E.D.Mich. 2000), both recognized that the Accountant Liability Act does not bar third-party beneficiary breach of contract actions. Hence, these courts recognized the propriety of breach of contract actions against accountants. Further, the *Stewart* court acknowledged that a breach of contract action may arise out of the same transaction as a malpractice action.

Finally, Ameritech states that it does allege a special agreement; FRC was retained to perform specific acts in connection with the 1997 Review, the 1998 Audit and the 1998 Compilation.

### 1. Applicable Law and Analysis

■ The Court finds that while Ameritech's Counterclaims do sound in negligence, the Motion to Dismiss with respect to Count II will nonetheless be denied.

Ameritech's Counterclaims do not allege that FRC failed to fulfill any particular contractual provisions. Rather, Ameritech claims that FRC failed to perform its ac-counting duties adequately and in compliance with professional standards. Ameritech's opening paragraph describes its Counterclaims as arising "out of the failure of the accounting firm of [FRC] to provide services complying with applicable professional standards." (Counterclaims at ¶ 1). In paragraph 14 of the Counterclaims, Ameritech specifies that FRC failed to adhere to the Generally Accepted Auditing Standards or the Statements On Standards For Accounting And Review Services. It is Ameritech's contentions that FRC knew or should have known that its work was not in compliance with those professional standards. (Counterclaims at ¶¶ 22 & 27).

Ameritech argues that it did allege the existence of distinct agreements that required FRC to perform specific acts, i.e., the 1997 Review, the 1998 Audit and the 1998 Compilation. However, its factual allegations are not that FRC failed to perform the specific acts it agreed to, but that FRC failed to perform them adequately. These claims sound in malpractice. *Stewart v. Rudner*, 349 Mich. 459, 468, 84 N.W.2d 816 (1957); *Barnard v. Dilley*, 134 Mich.App. 375, 350 N.W.2d 887 (1984).

Notwithstanding, FRC's Motion to Dismiss Count II will be denied. The primary basis of FRC's claim for dismissal regarding Count II is that, as a disguised malpractice claim, it is not assignable. Since the Court has already held that accounting malpractice claims are assignable, the Court will not dismiss Count II on the basis argued by FRC. To the extent that Ameritech is, in fact, alleging a breach of contract, the Court will reserve ruling on the dismissal of this count until after a period of discovery.

### C. Count III, Accounting Malpractice

The accounting malpractice claim under Count III is asserted by Ameritech in its

own capacity for damages it allegedly suffered directly because of FRC's alleged malpractice. FRC argues that, while Ameritech alleges at ¶ 57 of its Counterclaims that, "[o]n information and belief, FRC was informed in writing at the time of the engagement ... that a primary intent of Clover was for the professional accounting services to benefit or influence Ameritech," no claim is made that FRC ever identified Ameritech as an intended beneficiary. Consequently, under § 2962(c), FRC cannot be liable to Ameritech.

In response, Ameritech contends that its Counterclaims do not preclude the possibility that FRC wrote Clover back affirming that it understood that Ameritech would rely upon its work. Further, Ameritech argues that the Accountant Liability Act does not create a "writing back" requirement. Ameritech contends that a proper reading of § 2962(c) is that an accountant can be held liable to a third party if either the client or the accountant identifies the third party intended to benefit from the accounting services.

### 1. Applicable Law and Analysis

In pertinent part, the Accountant Liability Act provides:

This section applies to an action for professional malpractice against a certified public accountant. A certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant only in 1 of the following situations:

. . .

(c) A negligent act, omission, decision, or other conduct of the certified public accountant if the certified public accountant was informed in writing by the client at the time of engagement that a primary Intent of the client was for the professional public accounting services

to benefit or influence the person bringing the action for civil damages. For the purposes of this subdivision, the certified public accountant shall identify in writing to the client each person, generic group, or class description that the certified public accountant intends to have rely on the services. The certified public accountant may be held liable only to each identified person, generic group, or class description. The certified public accountant's written identification shall include each person, generic group, or class description identified by the client as being benefited or influenced.

M.C.L. § 600.2962.

M.C.L. § 600.2962(c) clearly requires that the accountant identify the individual to whom he/she intends to be liable. In addition to the client notifying the accountant of intended beneficiaries of the accounting services,

the certified public accountant *shall* identify in writing to the client each person, generic group, or class description that the certified public accountant intends to have rely on the services. The certified public accountant may be held liable only to each identified person, generic group, or class description. The certified public accountant's written identification shall include each person, generic group, or class description identified by the client as being benefited or influenced.

Section 2962(c).

Accordingly, Ameritech's argument that § 2962(c) does not require that the accountant write back acknowledging the intended beneficiaries is directly contrary to the plain language of the Act.

This finding by the Court that FRC's written acknowledgment that Ameritech was an intended beneficiary is necessary, is supported by *Ohio Farmers Ins. Co. v. Shamie,* 235 Mich.App. 417, 597 N.W.2d

553 (1999). That court stated that the Act requires both "the accountant and the client to give written notification regarding the intended use of the accountant's services and limiting the accountant's liability to clearly identified third parties." *Id.* at 422, 597 N.W.2d 553. Ameritech argues that this language from *Shamie* was pure dicta. It is true that the Shamie court held that the Act did not apply to the claim before it because that claim had vested prior to the effective date of the Act. Notwithstanding, the *Shamie* court's interpretation of the Act is consistent with the Act's language.

 Ameritech additionally argues that it need not plead that FRC named it (Ameritech) as a beneficiary, and that its allegations are sufficient to support an inference that FRC confirmed in writing that Ameritech would rely upon its work. However, the Court finds that a complaint must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory. *DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993). A material element of the accounting malpractice claim under Count III is that FRC identified Ameritech as a party that would rely upon its accounting services. While Ameritech does allege that FRC was informed in writing that a primary intent of Clover was for the accounting services to benefit or influence Ameritech (Counterclaims at ¶ 57), it makes no allegations that would allow the Court to infer that FRC identified Ameritech as a party FRC intended to have rely on its services. Thus, a material element of Count III is missing from the Counterclaims, and that Count will be dismissed.

## D. Count IV, Third–Party Beneficiary

 FRC argues that Ameritech does not claim that it was directly named as a beneficiary of any agreement, only that FRC knew that Ameritech would rely upon the 1998 Audit and 1998 Compilation. These alleged subjective intentions do not support a third-party beneficiary claim.

Citing *Shamie* in support, Ameritech responds that it is not required to plead that it was a direct beneficiary of the agreements between FRC and Clover.

### 1. Applicable Law and Analysis

Pursuant to M.C.L. § 600.1405:

Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

(1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

. . . .

 Thus, under Michigan law, an express promise to act for the benefit of a third-party must be made in order to create third-party beneficiary status. *Ohio Farmers Ins. Co. v. Shamie,* 235 Mich. App. 417, 427–428, 597 N.W.2d 553 (1999). Further, "[t]he test created by this statute is objective; the subjective intent of the parties to the contract is irrelevant." *Alcona Community Schools v. State,* 216 Mich.App. 202, 205, 549 N.W.2d 356 (1996).

Notwithstanding these well-settled rules, the court in *Shamie* appeared to rely on the subjective intent of the parties in the case before it to deny the defendants' motion for summary disposition. It stated:

In the present case, we should examine the contract between defendants and Marcelli to determine whether they objectively expressed the intent to treat plaintiff as a third-party beneficiary of the contract. *See Koenig [v.City of South Haven]*, [221 Mich.App. 711] *supra* at 716, 562 N.W.2d 509 [(1997)]. However, we cannot perform that examination because the pleadings do not include a copy of the contract. Therefore, our determination must be based on plaintiff's allegation that it was a third-party beneficiary of the contract because defendants knew (1) that Marcelli needed to deliver the financial statements to plaintiff for review and analysis and (2) that plaintiff would rely on the statements in determining whether to issue bonds to Marcelli. Plaintiff's allegations, which we must accept as true for purposes of this analysis, establish that defendants' contract to prepare Marcelli's financial statements was intended to benefit both Marcelli and plaintiff. Although Marcelli employed and authorized defendants to prepare the statements, plaintiff was the intended recipient and beneficiary of defendants' accounting services. Because defendants and Marcelli intended plaintiff to benefit from defendants' services, we cannot conclude that plaintiff's third-party beneficiary claim was 'so clearly unenforceable as a matter of law that no factual development could possibly justify recovery.' *Simko [v. Blake]*, [448 Mich. 648] *supra* at 654, 532 N.W.2d 842 [(1995)]. Accordingly, we hold that the trial court did not err in denying defendants' motion for summary disposition pursuant to MCR 2.116(C)(8).

*Shamie* at 428, 597 N.W.2d 553.

The Court finds that *Shamie* is completely inconsistent with the rule that subjective intentions are insufficient. And, the allegations relied upon by the court did not show or even suggest that the defendants made an objectively manifested a promise to act for the benefit of the plaintiffs.

Because it appears that *Shamie* was, at least, on this point, contrary to otherwise settled Michigan law, and because Ameritech's allegations are not sufficient for the Court to infer that FRC ever promised to act on Ameritech's behalf, the Court will dismiss Count IV of Ameritech's Counterclaims.

### IV. *Conclusion*

For the foregoing reasons, the Court will grant in part and deny in part, FRC's Motion to Dismiss. The Court holds that accounting malpractice actions are assignable under Michigan law and, therefore, will not dismiss Counts I and II. However, the Court holds that Ameritech's allegations do not support an inference that FRC objectively manifested an intent that Ameritech benefit from its accounting services. Hence, Ameritech has failed to satisfy the requirements of the Accountant Liability Act or the Third–Party Beneficiary Act, and Counts III and IV of its Counterclaims will be dismissed.

IT IS SO ORDERED.