36 A.3d 1049

CAST ART INDUSTRIES, LLC, SCOTT SHERMAN, GARY BARSEL-LOTTI, AND FRANK COLAPINTO, PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. KPMG LLP, DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND JOHN QUINN, JOHN SHAW, ED LAZOR, AND FRANK CASAL, DEFENDANTS.

Argued September 13, 2011—Decided February 16, 2012.

*Douglas S. Eakeley* argued the cause for appellant and cross-respondent (*Lowenstein Sandler,* attorneys).

*Michael J. Avenatti,* a member of the California bar, argued the cause for respondents and cross-appellants (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Avenatti* and *Alan Wasserman,* of counsel; *Mr. Avenatti, Mr. Wasserman, Louis A. Greenfield,* and *Carrie S. Ford,* on the briefs).

*Michael K. Furey* submitted a brief on behalf of amici curiae New Jersey Society of Certified Public Accountants and American Institute of Certified Public Accountants (*Riker Danzig Scherer Hyland & Perretti,* attorneys; *Mr. Furey* and *Stephanie R. Wolfe,* on the briefs).

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

Following a lengthy trial in this accounting malpractice action, a jury returned a verdict in plaintiffs' favor and awarded damages totaling $31.8 million. Following post-trial motions and computation of pre-judgment interest, the trial court entered an amended final judgment against defendant for $38,096,902. Defendant appealed and plaintiffs cross-appealed from that judgment. In a published opinion, the Appellate Division upheld the verdict on liability but vacated the damage award and remanded for a new trial on damages. *Cast Art Indus., LLC v. KPMG LLP*, 416 *N.J.Super.* 76, 3 *A.*3d 562 (App.Div.2010). Defendant petitioned for certification, and plaintiffs submitted a cross-petition, both of which we granted. *Cast Art Indus., LLC v. KPMG LLP*, 205 *N.J.* 77, 12 *A.*3d 209, 210 (2011). After reviewing the extensive record and considering the arguments advanced, we have concluded that the verdict in favor of plaintiffs cannot stand, and we reverse the judgment of the Appellate Division.

## I.

Plaintiffs commenced this litigation seeking damages for the losses they said they incurred following the bankruptcy and subsequent liquidation of Cast Art Industries (Cast Art). The business of Cast Art was the production and sale of collectible figurines and giftware. The individual plaintiffs, Scott Sherman, Gary Barsellotti, and Frank Colapinto, were Cast Art's shareholders. As Cast Art's president, Sherman managed the business, which was located in California. Barsellotti was responsible for production, and Colapinto was in charge of sales. Because the claims of Cast Art and the individual plaintiffs are inextricably intertwined, we shall hereafter, for purposes of this opinion, refer simply to Cast Art and plaintiff in the singular.

Papel Giftware (Papel), located in New Jersey, was in the same line of business as Cast Art, and in the spring of 2000 Cast Art became interested in acquiring Papel. Among the factors that

made such an acquisition attractive to Cast Art were Papel's large number of existing customer accounts, its existing sales force, and its production facilities. Cast Art retained the services of attorneys (Latham & Watkins), investment bankers (Friedman Billings & Ramsey), and accountants (Moss Adams) to advise it in connection with this proposed transaction. Eventually, it decided that a merger, rather than an acquisition, would be the preferable format for such a transaction. Cast Art lacked the financial ability to complete such a transaction on its own. As a result, it negotiated a loan agreement with PNC Bank (PNC) for $22 million to fund the venture. One of PNC's conditions to advancing the $22 million loan, however, was that it receive audited financial statements of Papel. An additional condition, insisted on by PNC and agreed to by Sherman, was that he personally guarantee $3.3 million of the loan.

Defendant KPMG had audited Papel's financial statements since 1997, when Papel's principal, Joel Kier, had acquired it from a prior owner. KPMG was already in the process of auditing Papel's 1998 and 1999 financial statements when Cast Art and Papel began their merger discussions. In its letter to the chairman of Papel's audit committee, dated November 17, 1999, in which it agreed to undertake these audits and report the results, KPMG noted the parameters of its work:

> An audit is planned and performed to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, there is a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an audit performed in accordance with generally accepted auditing standards. Also, an audit is not designed to detect matters that are immaterial to the financial statements.

The process of KPMG completing its audits of Papel's financial statements for the years 1998 and 1999 was protracted; KPMG attributed this delay in part to difficulties it encountered in obtaining the necessary records from Papel. In addition, tensions developed between John Quinn, the KPMG partner responsible for the audit, and Frederick Wasserman, Papel's chief financial offi-

cer, when Wasserman resisted certain adjustments that KPMG concluded had to be made to Papel's financial statements. Eventually, Wasserman agreed to certain of the adjustments, and KPMG concluded that the remainder were immaterial, and thus it waived their inclusion. In September 2000, KPMG delivered to Papel the completed audits for the years 1998 and 1999. KPMG included the following statement in its accompanying opinion letter, which again was addressed to the chairman of Papel's audit committee:

> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

KPMG concluded its opinion letter to Papel with the observation that as of December 31, 1999, Papel "was not in compliance with certain financial covenants" with its lenders, which KPMG characterized as raising "substantial doubt about the Company's ability to continue as a going concern."

Cast Art obtained copies of the completed 1998 and 1999 audits and provided copies to PNC in satisfaction of its obligation under the loan agreement. Three months later, in December 2000, Cast Art and Papel consummated the merger. Shortly after the merger was finalized, Cast Art began to experience difficulty in collecting some of the accounts receivable that it had believed Papel had had outstanding prior to the merger. Cast Art began its own investigation and learned that the 1998 and 1999 financial statements prepared by Papel were inaccurate and that Papel evidently had engaged regularly in the practice of accelerating revenue.

Papel's financial statements had noted that Papel's stated policy was to recognize revenue from sales when goods were shipped and invoices sent. Papel did not comply with that policy, however, and would routinely book revenue from goods that had not yet been

shipped. For example, testimony at trial established that Papel would pack goods for shipment and book the revenue but then simply place the shipping cartons in trailers on its property and color code the invoices to note when the goods were, in fact, to be shipped and billed. There was also testimony that at certain points Papel would not close out its books at month's end. Rather, it would hold them open and book in the improperly extended month revenue that was earned in the following period. There was also testimony that at least one transaction, referred to at trial as the "Bookman" transaction, was a fraudulent entry of a $121,244 sale that never occurred.

Although Cast Art knew at the time of the merger that Papel was carrying a significant amount of debt, it was unaware of those accounting irregularities until after the merger was complete. The surviving corporation was unable to generate sufficient revenue to carry its debt load and produce new goods, and it eventually failed.

## II.

In this litigation, Cast Art alleged that KPMG negligently audited Papel because its audit had not revealed Papel's accounting irregularities and sought to recover for the loss of its business. It contended that if KPMG had performed a proper audit, it would have uncovered the fraudulent accounting activity that was taking place at Papel. Cast Art further maintained that it never would have proceeded with the merger if it had been alerted to this fraud. Thus, Cast Art asserted that its losses were caused by KPMG's negligence, and it argued that KPMG should be responsible to make it whole.

KPMG defended this litigation on several fronts. It argued that because Cast Art had not retained it to audit Papel, Cast Art was not its client, and Cast Art's claim was consequently barred by the Accountant Liability Act, *N.J.S.A.* 2A:53A–25. Prior to trial, KPMG unsuccessfully sought summary judgment on that basis. At trial KPMG denied any negligence on its part and stressed that

Cast Art had received advice cautioning it not to proceed with the merger in light of Papel's poor financial condition. KPMG also maintained that Cast Art's failure was attributable to factors that were wholly unrelated to the actions of KPMG. It pointed, for instance, to a decrease in sales that Cast Art had experienced before the merger and also contended there was a general downturn in the collectibles market.

As we noted earlier, Cast Art prevailed in the trial court. On appeal, KPMG argued to the Appellate Division, as it had to the trial court, that Cast Art's action was precluded by *N.J.S.A.* 2A:53A–25. KPMG also argued that Cast Art had failed to establish negligence in the manner in which KPMG had audited Papel's financial statements and that the trial court had erred in its charge to the jury with respect to the question of negligence, as well as in certain other respects. It also contended that Cast Art had failed to prove a sufficient causal link between the actions of KPMG and the losses Cast Art incurred. Finally, KPMG asserted that Cast Art's proofs with respect to its damages were insufficient.

The Appellate Division rejected KPMG's statutory argument, *Cast Art, supra,* 416 *N.J.Super.* at 87, 91–92, 3 *A.*3d 562, as well as the bulk of KPMG's other arguments. It did concur, however, that Cast Art's proofs with respect to its damages were insufficient, and it thus set aside the judgment entered by the trial court and remanded the matter for a new trial on damages only. *Id.* at 107, 110–11, 3 *A.*3d 562.

### A.

KPMG presents a number of arguments in support of its position in this Court. It contends that the construction placed on *N.J.S.A.* 2A:53A–25 by the trial court and the Appellate Division was incorrect and had the effect of reinstating foreseeability as the test to determine the scope of accountant liability to third parties. KPMG asserts that under the proper construction of the Accountant Liability Act, it could not be held liable to Cast Art because KPMG did not know at the time it agreed to perform

these audits that Papel and Cast Art were contemplating a merger and that Cast Art would be relying on its auditing work. It argues that the Appellate Division misconstrued the evidence presented at trial when it held that plaintiff "presented more than sufficient evidence to establish that KPMG knew that its audit of Papel's 1999 financial statement would be 'made available' to Cast Art in connection with its proposed merger with Papel." *Cast Art, supra,* 416 *N.J.Super.* at 90, 3 *A.*3d 562. Along this vein, it contends that the Appellate Division erroneously concluded that mere knowledge by KPMG that Cast Art needed the audit reports to complete the merger transaction equaled an agreement by KPMG that it owed an independent duty to Cast Art, apart from its duty to Papel.

KPMG also asserts that the trial court erred in its charge to the jury when it instructed the panel that it could, in determining whether KPMG departed from the appropriate standard of care, look not only to generally accepted auditing standards but to the training materials KPMG used for its own staff, which stressed the importance of "seek(ing) out fraud." During the course of the trial, plaintiff regularly pointed to those training materials and KPMG's failure to detect Papel's improper accounting techniques as evidence that KPMG had breached the professional standard of care.

KPMG also contends that Cast Art failed to demonstrate how deficiencies that might have existed in its audit reports proximately caused the collapse of Cast Art. While it agrees with the conclusion of the Appellate Division that Cast Art's proofs with respect to its damages were insufficient, it argues the remedy should be a dismissal, not a remand for further proceedings. Finally, KPMG argues that the trial court's charge on damages was incorrect; it contends that the measure of Cast Art's damages, if any, was its lost profits, not the value of the business itself.

## B.

Cast Art, on the other hand, rejects KPMG's construction of *N.J.S.A.* 2A:53A–25. It contends that an accountant may be held

liable to a third party if the accountant, at any time prior to the completion of its work, knows that its work will be made available to, and will be relied on by, that nonclient third party. In addition, Cast Art points to Sherman's testimony with respect to a conference call involving Cast Art and KPMG to support its position that KPMG knew the significance its audit reports held for Cast Art.

Cast Art also argues that the trial court's instructions with respect to the standard of care were appropriate and that the testimony of its forensic accounting expert, Henry Stotsenberg, established KPMG's negligence. In relevant part, Stotsenberg told the jury that KPMG did not comply with either generally accepted auditing standards or its own training materials when it conducted its audits of Papel's financial statements.

Similarly, Cast Art stresses that the trial court's instructions with respect to proximate cause were correct. It notes that the trial court framed its instructions in terms of the substantial factor test, telling the jury that it had to determine whether KPMG's conduct was "a substantial factor contributing to the plaintiff's injury." It urges that we reject KPMG's argument with respect to causation, which rests on KPMG's contention that plaintiff had to establish that negligence on its part caused the subsequent failure of Cast Art. Cast Art contends that KPMG, in this portion of its argument, is attempting to engraft onto New Jersey tort law the concept of "loss causation" from its source in federal securities law.

In its cross-petition, Cast Art argues that the Appellate Division improperly vacated the jury's damages award because that award finds support within the record.

### C.

Two amici, New Jersey Society of Certified Public Accountants and American Institute of Certified Public Accountants, participated in the appeal before the Appellate Division and before this Court. Both amici contend that the Appellate Division's construc-

tion of *N.J.S.A.* 2A:53A–25 was incorrect and contrary to the intent of the Legislature when it adopted this statute. The amici also argue that the Appellate Division erred when it concluded that the trial court's reference to internal training materials as part of its instructions with respect to the standard of care governing KPMG's conduct was harmless error. The amici urge us to reject the approach adopted by the Appellate Division because that approach will discourage accountants from developing or following internal initiatives for the detection of fraud lest those efforts subject them to increased liability.

### III.

We do not find it necessary to address all of the contentions put forth by the parties and the amici. In our judgment, the dispositive issue is the proper construction of the Accountant Liability Act, *N.J.S.A.* 2A:53A–25.

The arguments put forth by the parties with respect to the proper construction of *N.J.S.A.* 2A:53A–25 are best understood and analyzed if there is an appreciation of the historical development of the manner in which courts have addressed the issue of an auditor's potential liability to nonclient third parties. Such an appreciation, in turn, requires an understanding of the fundamental nature and purpose of an audit.

> An audit is a systematic, objective examination of a company's financial statements. . . . The purpose of an audit is to determine if the statements fairly present the financial condition of the company. . . .
>
> After concluding the audit, the auditor issues its report [which] expresses the auditor's independent, professional opinion about the fairness of the financial statements. . . .
>
> [Feinman, *Liability of Accountants for Negligent Auditing: Doctrine, Policy and Ideology*, 31 *Fla. St. U.L.Rev.* 17, 21 (2003).]

Because an auditor's report may be circulated well beyond the borders of its subject, case law has developed three analytical frameworks within which to consider whether and under what circumstances auditors may be held liable for their negligence in conducting an audit. The earliest cases dealing with the question

of an auditor's liability to third parties for negligence required the existence of privity or its equivalence as a necessary precondition to holding an auditor liable.

The leading case standing for that principle is *Ultramares v. Touche*, 255 *N.Y.* 170, 174 *N.E.* 441 (1931). The defendant in that case had for several years audited the financial statements of a rubber dealer, Fred Stern & Co. (Stern). *Id.* at 442. In accordance with its past practice, the defendant audited Stern's records for the year 1923 and at the completion certified that the balance sheet it had prepared from Stern's records "present[ed] a true and correct view" of the company's financial condition. *Ibid.* The plaintiff, a factor, relied on the defendant's audit and advanced significant funds to the company. *Id.* at 443. Unbeknownst to the defendant auditor, employees of Stern had entered false transactions into the company's records, and in fact Stern was insolvent when the defendant had reported a net worth in excess of $1 million. *Id.* at 442. The plaintiff factor sued the defendant auditor to recover its losses. *Id.* at 443. The New York Court of Appeals held the auditor did not owe a duty of care to the factor, and thus the factor could not sue the auditor for negligence. *Id.* at 444–46. To impose liability for negligence on an auditor in the absence of privity or an equivalent relationship, wrote Justice Cardozo, "may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 444.

New York, in essence, retains this test although it no longer insists on contractual privity; rather, it requires "some conduct on the part of the accountants linking them" to the parties claiming a loss. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 *N.Y.*2d 536, 493 *N.Y.S.*2d 435, 483 *N.E.*2d 110, 118 (1985).

The Restatement (Second) of Torts formulated a somewhat broader test.

One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the

> information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> [*Restatement (Second) of Torts* § 552(1) (1977)].

To forestall the "indeterminate" liability forecast by the *Ultramares* court, subsection (2) of § 552 limits the scope of this potential liability "to those persons, or classes of persons, whom [the accountant] knows and intends will rely on his opinion, or whom he knows his client intends will so rely." *Feinman, supra,* 31 *Fla. St. U.L.Rev.* at 43 (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 *N.C.* 200, 367 *S.E.*2d 609, 617 (1988)).

New Jersey rejected those tests in *Rosenblum v. Adler,* 93 *N.J.* 324, 461 *A.*2d 138 (1983). In that case, the plaintiffs owned and operated two businesses that they sold to Giant Stores Corporation (Giant) and as part of that sale, plaintiffs received stock in Giant. *Rosenblum, supra,* 93 *N.J.* at 329–30, 461 *A.*2d 138. The defendants were partners in Touche Ross & Co., the accounting firm that had audited Giant's financial statements during the relevant time period. *Id.* at 329, 461 *A.*2d 138. The firm had not, however, been directly involved in the negotiations between the plaintiffs and Giant. *Id.* at 330, 461 *A.*2d 138. The Giant stock the plaintiffs received subsequently turned out to be worthless when it was learned that the financial statements prepared by Giant and audited by Touche were false. *Id.* at 331, 461 *A.*2d 138. The plaintiffs sued for their losses, alleging Touche had been negligent in its audit of Giant's books. *Id.* at 332, 461 *A.*2d 138. The defendants responded they could not be held responsible to the plaintiffs, with whom they had had no contractual relationship. The Court rejected that contention with the following statement:

> When the independent auditor furnishes an opinion with no limitation in the certificate as to whom the company may disseminate the financial statements, he has a duty to all those whom that auditor should reasonably foresee as recipients from the company of the statements for its proper business purposes, provided that the recipients rely on the statements pursuant to those business purposes.... In those circumstances accounting firms should no longer be permitted to hide within the citadel of privity and avoid liability for their malpractice.
>
> [*Id.* at 352–53, 461 *A.*2d 138.]

Only a few states adopted this expansive foreseeability test, *see* *Feinman, supra,* 31 *Fla. St. U.L.Rev.* at 28, 40–41, and New Jersey has, through the passage of *N.J.S.A.* 2A:53A–25 in 1995, since abandoned it.

*N.J.S.A.* 2A:53A–25(b)(2) established preconditions to the imposition of liability on an accountant to a nonclient third party. These preconditions are that the accountant

(a) knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;

(b) knew that the claimant intended to rely upon the professional accounting service in connection with the specified transaction; and

(c) directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service.

[*N.J.S.A.* 2A:53A–25(b)(2).]

Clearly, KPMG did not know in November 1999, when it agreed to perform this audit, that its work could play a role in a subsequent merger because its agreement predated by several months Cast Art's interest in Papel. Cast Art urges that the statute should not be given such a restrictive interpretation and that the phrase "at the time of the engagement" should be construed to mean "at any time during the period of the engagement." KPMG, on the other hand, contends the phrase means "at the outset of the engagement."

We note first the principles guiding an issue of statutory interpretation. When called on to interpret a statute, "our overriding goal must be to determine the Legislature's intent." *State v. Gonzalez,* 142 *N.J.* 618, 627, 667 *A.*2d 684 (1995) (citations omitted). The starting point in that analysis is, of course, the language selected by the Legislature. *Hubbard ex rel. Hubbard v. Reed,* 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001) (citations omitted). When that language "is clear on its face, 'the sole function of the courts is to enforce it according to its terms.'" *Ibid.* (quoting

*Sheeran v. Nationwide Mut. Ins. Co.*, 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979) (internal quotation omitted)).

      Certain fundamental principles guide our consideration of the language the Legislature selected. "[A] statute's 'words and phrases shall be read and construed within their context' and 'given their generally accepted meaning.' " *Burnett v. County of Bergen*, 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009) (quoting *N.J.S.A.* 1:1–1). Further, "[w]e must presume that every word in a statute has meaning and is not mere surplusage. . . ." *In re Attorney General's Directive*, 200 *N.J.* 283, 297–98, 981 *A.*2d 64 (2009) (citation omitted). "Interpretations that render the Legislature's words mere surplusage are disfavored." *In re Commitment of J.M.B.*, 197 *N.J.* 563, 573, 964 *A.*2d 752 (2009). Rather, "our task requires that every effort be made to find vitality in the chosen language." *Ibid.* One other canon of statutory construction guides our analysis: if the language selected by the Legislature is ambiguous or admits of more than one plausible interpretation, courts may turn to extrinsic evidence such as legislative history to discern the legislative intent. *DiProspero v. Penn*, 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005) (noting "if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.' ") (quoting *Cherry Hill Manor Assocs. v. Faugno*, 182 *N.J.* 64, 75, 861 *A.*2d 123 (2004) (internal quotations omitted)).

The Appellate Division, in concluding that the phrase "at the time of the engagement" was not limited to the point of Papel's initial hiring of KPMG, referred to the Code of Professional Conduct of the American Institute of Certified Professional Accountants. Under that Code, an accountant's "engagement" spans the entire period of the professional relationship with the client. *Cast Art, supra*, 416 *N.J.Super.* at 88–89, 3 *A.*3d 562. It rejected KPMG's argument that the additional phrase "by the client" indicated a more restrictive meaning to the term "engagement." *Id.* at 89, 3 *A.*3d 562.

In our judgment, this analysis does not go far enough. The phrase "at the time of the engagement by the client" is susceptible of two plausible interpretations. It is appropriate to look at the legislative history of the Accountant Liability Act to discern which interpretation—Cast Art's broad construction or KPMG's more restrictive reading—would more closely effectuate the Legislature's intent. It is also instructive to consider whether other states have used this formulation and, if so, how their courts have construed it.

We turn first to the indications that we glean of the Legislature's intent as it considered passage of this bill. The statute as enacted in New Jersey varies in several minor respects from the Uniform Accountancy Act, upon which it is modeled. We do not consider any of those variations particularly useful tools in attempting to discern the legislative intent. The Sponsor's Statement that accompanied introduction of this bill, however, contains a clear statement of its intended purpose: "This bill would limit accountants' liability to third parties for the accountants' negligent acts." *Sponsor's Statement, Statement to Senate Bill No. 826* (March 10, 1994). The Statement said that this Court's decision in *Rosenblum, supra,* had "weakened" the necessity of privity between an accountant and a claimant bringing suit against him and explained that the "bill would restore the concept of privity to accountants' liability towards third parties." *Id.* Since passage of the statute, we have explicitly noted this "manifest legislative intent . . . to limit the impact of . . . *Rosenblum.*" *E. Dickerson & Son, Inc. v. Ernst & Young, LLP,* 179 *N.J.* 500, 504, 846 *A.*2d 1237 (2004). In our judgment, this clear statement of a legislative intent to restrict the potential scope of an accountant's liability must inform our interpretation of the words selected by the Legislature.

The bill was originally introduced in March 1994 as S–826. In its original form, subsection (b)(2)(a) required as a condition to holding an accountant liable to a third party that the accountant "knew at the time of the engagement, or agreed with the client after the

time of the engagement" that the accountant's work would be made available to that third party. Additionally, subsection (b)(2)(b) required that the accountant be "aware" that that party "intended to rely" on the accountant's work.

The Legislature amended those two subsections prior to final passage. Subsection (b)(2)(a) was amended by the insertion of the phrase "by the client" immediately after "at the time of the engagement" and subsection (b)(2)(b) was amended to require not merely that the accountant be "aware" of the third party's intent to rely on his work but that the accountant "knew" that the third party intended to rely on his work.

The Appellate Division declined to attribute any particular significance to the phrase "by the client," concluding that it could not serve to alter the meaning of the word "engagement" contained in the Code of Professional Conduct, which we set forth earlier in this opinion. *Cast Art, supra,* 416 *N.J.Super.* at 89, 3 *A.*3d 562.

We are unable to agree with the Appellate Division's conclusion. If the word "engagement" in isolation encompasses the entire period of the professional relationship, the addition of the modifying clause "by the client" would serve no purpose if the word "engagement" is construed to encompass that original expansive definition. But, as we have noted, courts "must presume that every word in a statute has meaning and is not mere surplusage...." *In re Attorney General's Directive, supra,* 200 *N.J.* at 297–98, 981 *A.*2d 64.

We find additional guidance in the fact that at the same time the Legislature inserted the phrase "by the client," it strengthened subsection (b)(2)(b) by requiring actual knowledge on the part of the accountant, not mere general awareness. In our judgment, a construction of the statute that interprets the phrase "at the time of the engagement" to mean "at the outset of the engagement" is more consonant with the overall intent of the Legislature to narrow the circumstances under which an account-

ant may be liable to a third party than a construction that interprets the phrase to mean "any time during the engagement."

Several other states have also adopted statutes, modeled on the Uniform Accountancy Act, that limit the scope of an accountant's liability to a nonclient. *See, e.g., Ark.Code Ann.* § 16–114–302 (Michie 1998); 225 *Ill. Comp. Stat.* 450/30.1 (West 1998); *Kan. Stat. Ann.* § 1–402 (West 1998); *La.Rev.Stat. Ann.* § 37:91 (West 1999); *Mich. Comp. Laws* § 600.2962 (1998); *Utah Code Ann.* § 58–26–12 (1998); *Wyo. Stat. Ann.* § 33–3–201 (Michie 1998).

We have reviewed these to determine if they might provide some guidance. Of these statutes, only Kansas and Michigan use the phrase "at the time of" the engagement. Both Kansas and Michigan, though, omit New Jersey's modifying phrase "by the client." Louisiana and Wyoming refer to awareness by the accountant "at the time the engagement was undertaken" while the Arkansas, Illinois, and Utah statutes omit the topic entirely.

Our research has located only three reported cases bearing even tangentially on the issue before us. *Gillespie v. Seymour,* 14 *Kan.App.*2d 563, 796 *P.*2d 1060, 1062 (1990) (dismissing claim against accountants for failure to allege that accountants "knew at the time they performed their services" that their work would be provided to trust beneficiaries); *Solow v. Heard McElroy & Vestal,* 7 *So.*3d 1269 (La.Ct.App.2009) (affirming summary judgment in favor of accountants in action brought by creditor of defunct business; accountants not aware when engagement accepted that audited statements would be used in connection with sale of the business); *Riley v. Ameritech Corp.,* 147 *F.Supp.*2d 762 (E.D.Mich.2001) (dismissing under *F.R.C.P.* 12(b)(6) third party's malpractice action against accountants; statute requires written notification to accountant and written acknowledgment by accountant that work intended to benefit others). None provide any reason to retreat from the conclusions we reached after examining the legislative history of *N.J.S.A.* 2A:53A–25.

■ Our conclusion with respect to the proper construction of the Accountant Liability Act is fortified by the nature of an engagement letter, for an auditor's "liability must be defined by the scope of the engagement it entered." *NCP Litig. Trust v. KPMG,* 187 *N.J.* 353, 382, 901 *A.*2d 871 (2006). An auditor is entitled to know at the outset the scope of the work it is being requested to perform and the concomitant risk it is being asked to assume. We have earlier set forth the pertinent language of KPMG's engagement letter with Papel with respect to those audits, and it is silent as to Cast Art. Thus, at the outset of its engagement with Papel, KPMG was not told that a nonclient would be relying on its work.

■ Cast Art contends that its cause of action nonetheless fits within that portion of the statute permitting a third party to seek recovery from an accountant if the accountant "agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant." *N.J.S.A.* 2A:53A–25(b)(2)(a). It points to Sherman's testimony that he had a conference call with an unnamed KPMG representative in which he inquired about the status of the audit and was assured it would be forthcoming. This, Cast Art maintains, satisfies the statutory mandate.

We do not agree. In our judgment, the most that can be said is that Sherman's testimony would support an inference that KPMG was aware that Cast Art required audited financial statements to proceed with the planned merger. The statute, however, requires agreement, not mere awareness, on the part of the accountant to the planned use of his work product. Sherman's testimony is wholly inadequate in that respect.

We note, moreover, the evidence presented at trial that Cast Art, while waiting for the final audit report, asked that it and its accountants, Moss Adams, be permitted to review KPMG's work papers in connection with the 1998 audit. KPMG agreed, after

securing the consent of Papel. KPMG advised Cast Art by letter dated August 28, 2000, of the terms under which that inspection would be permitted.

[O]ur use of professional judgment and the assessment of materiality for the purpose of our work means that matters may have existed that would have been assessed differently by Cast Art or Moss Adams. We make no representation as to the sufficiency or appropriateness of the information included in our work papers for your purposes. The auditing procedures that we performed were restricted to those required under generally accepted auditing standards to enable us to formulate and express an opinion on the fairness of presentation of [Papel's] 1998 consolidated financial statements taken as a whole....

Our audit of [Papel's] 1998 consolidated financial statements was performed (and the work papers prepared in connection therewith were made) for the purpose stated above and not planned or conducted in contemplation of the proposed transaction between [Papel] and Cast Art. Therefore, items of possible interest to Cast Art may not have been specifically addressed.... Accordingly, our audit, and the work papers prepared in connection therewith, were not intended for the benefit of Cast Art and are not to be taken to supplant other inquiries and procedures that Cast Art should undertake for the purpose of considering the transaction....

In consideration of KPMG ... allowing Cast Art and Moss Adams access to the work papers ... and to the information contained therein, Cast Art agrees that it does not acquire any right as a result of such access that it would not otherwise have had. Cast Art also agrees that KPMG has not assumed any duties or obligations as a result of permitting access that it would not otherwise have had.

Cast Art's chief financial officer signed the letter, indicating its acceptance of those terms and parameters.

Because Cast Art failed to establish that KPMG "knew at the time of the engagement by the client" or thereafter agreed that Cast Art could rely on its work in proceeding with this merger, Cast Art failed to satisfy the requisite elements of *N.J.S.A.* 2A:53A–25(b)(2), and KPMG was entitled to judgment. We thus reverse the contrary judgment of the Appellate Division. In light of this conclusion, the remaining issues raised by the parties in conjunction with this appeal are moot and need not be addressed.

## IV.

The judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for entry of a judgment of dismissal.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, HOENS and Judge WEFING (temporarily assigned)—5.

*Not participating*—Justices ALBIN and PATTERSON—2.