3 A.3d 562 (2010)
416 N.J. Super. 76
CAST ART INDUSTRIES, LLC, Scott Sherman, Gary Barsellotti, and Frank Colapinto, Plaintiffs-Respondents/Cross-Appellants,
v.
KPMG LLP, Defendant-Appellant/Cross-Respondent, and
John Quinn, John Shaw, Ed Lazor, and Frank Casal, Defendants.
Docket No. A-2479-08T2
Superior Court of New Jersey, Appellate Division.
Argued April 27, 2010.
Decided August 26, 2010.
*566 Douglas S. Eakeley argued the cause for appellant/cross-respondent (Lowenstein Sandler, attorneys; Mr. Eakeley, Maureen A. Ruane, Roseland, and David M. Reiner, on the brief).
Michael Avenatti (Eagan, O'Malley & Avenatti) of the California bar, admitted pro hac vice, argued the cause for respondents/cross appellants (Wilentz, Goldman & Spitzer and Mr. Avenatti, attorneys; Alan Wasserman, Woodbridge, and Mr. Avenatti, of counsel and on the brief; Jeffrey J. Brookner and Louis A. Greenfield, Woodbridge, on the brief).
Riker, Danzig, Scherer, Hyland & Perretti, and Richard I. Miller, of the New York bar, admitted pro hac vice, attorneys for amici curiae New Jersey Society of Certified Public Accountants and American Institute of Certified Public Accountants (Mr. Miller, Jersey City, of counsel; Michael K. Furey and Stephanie R. Wolfe, Morristown, on the brief).
Before Judges SKILLMAN, GILROY and SIMONELLI.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
This appeal presents significant issues regarding the interpretation of the Accountant Liability Act, N.J.S.A. 2A:53A-25, which delineates the circumstances under which an accountant may be held liable for accounting malpractice to a party other than the accountant's client. The appeal also presents significant issues regarding the elements of a cause of action for accounting malpractice and the measure of damages if a plaintiff establishes that accounting malpractice caused the destruction of its business.
We conclude that the evidence presented by plaintiffs satisfied the prerequisites of the Accountant Liability Act for imposition of a duty of care upon an accountant to a party other than its client. We also conclude that plaintiffs presented sufficient evidence to establish all the elements of a cause of action for accounting malpractice and that the value as of the date of the merger of plaintiffs' business, which failed after the merger, was a proper measure of plaintiffs' damages. However, we conclude that the evidence presented by plaintiffs did not provide an adequate foundation for the jury's damages award and therefore a new trial on damages is required.

I.
Plaintiff Cast Art was a California giftware manufacturer and wholesale distributor. Plaintiff Scott Sherman was its president, and the other individual plaintiffs were shareholder/officers of Cast Art.
Papel Giftware was a rival distributor of giftware. Sometime in late 1999 or early 2000, Cast Art's management began discussions with Papel's management concerning the possible acquisition of Papel.
*567 These discussions resulted in a merger of the two companies in late 2000. To be able to enter into this transaction, Cast Art had to borrow $22 million to refinance Papel's excessive debt. Sherman guaranteed $3.3 million of this amount personally. Under the merger agreement, Papel's shareholders obtained 19% of the stock in the new company and Cast Art's shareholders retained the remaining 81%.
Within a year of the merger, Cast Art's management learned that Papel's accounts receivable in the years before the merger were significantly less than had been represented in Papel's financial statements. The merged company experienced substantial financial losses, and in 2003, it terminated the business and liquidated its assets.
At the time of the merger, and for a number of years before, defendant KPMG had been Papel's auditor. KPMG prepared audited financial statements for Papel for its fiscal years ending December 31, 1997, 1998, and 1999. The problems KPMG's auditors encountered with Papel's management in preparing those audits, KPMG's awareness of the negotiations between Papel and Cast Art during the period when the 1999 financial statement was being prepared, and the communications between Cast Art's management and KPMG representatives before the 1999 financial statement was issued and the merger consummated, are discussed in detail later in this opinion.
After its demise, Cast Art and its principals brought this accounting malpractice action against KPMG. Plaintiffs asserted claims for negligence, negligent misrepresentation, and fraud, and sought both compensatory and punitive damages. Plaintiffs subsequently moved for leave to amend their complaint to assert claims for recklessness and aiding and abetting fraud. The trial court denied these motions.
Following discovery, KPMG moved for summary judgment. The trial court granted summary judgment dismissing plaintiffs' fraud claims, but denied the motion with respect to plaintiffs' negligence claims. The trial court dismissed plaintiffs' punitive damages claim at an early stage of the case and later reaffirmed that dismissal on several subsequent occasions.
The case was tried before a jury over the course of twenty-two days. We defer discussion of the trial testimony and exhibits until later in the opinion.
The jury decided plaintiffs' malpractice and negligent misrepresentation claims in their favor and awarded them $31.8 million in damages, which represented what plaintiffs claimed Cast Art was worth at the time of the merger. KPMG filed a motion for a judgment notwithstanding the verdict, new trial, and remittitur. The trial court denied the motion, except for a $1.8 million reduction in the damages award, representing the amount Cast Art recovered in an action against Papel's principals.[1] Accordingly, the court entered an amended final judgment against KPMG for $30 million plus $8,096,902 in prejudgment interest.
KPMG has appealed from this judgment, and plaintiffs have filed a conditional cross-appeal from the dismissal of their fraud and punitive damage claims and the denial of their motions to amend their complaint to assert claims for recklessness and aiding and abetting fraud.

II.
The threshold issue presented by this appeal is whether plaintiffs presented sufficient *568 evidence to support a finding that KPMG owed them a duty of care under the Accountant Liability Act, which provides in pertinent part:
b. Notwithstanding the provisions of any other law, no accountant shall be liable for damages for negligence arising out of and in the course of rendering any professional accounting service unless:
(1) The claimant against the account was the accountant's client; or
(2) The accountant:
(a) knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;
(b) knew that the claimant intended to rely upon the professional accounting service in connection with that specified transaction; and
(c) directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service[.] ...
[N.J.S.A. 2A:53A-25.]
Cast Art and its principals were not KPMG's clients. Consequently, KPMG owed them a duty of care only if KPMG's dealings with them satisfied the three-part test set forth in N.J.S.A. 2A:53A-25(b)(2).
The Legislature's objective in enacting this three-part test was to overturn the test set forth in H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 352, 461 A.2d 138 (1983), which held that an accountant has a duty of care to a party other than its client in auditing a financial statement if the accountant should "reasonably foresee" that that party will rely upon the financial statement for a proper business purpose, and to establish a more restrictive test for imposition of a duty of care upon an accountant to parties other than its client. See E. Dickerson & Son, Inc. v. Ernst & Young, LLP, 179 N.J. 500, 504, 846 A.2d 1237 (2004).
Initially, we note that KPMG did not become aware of Papel's discussions with Cast Art concerning a possible acquisition of its business until the spring of 2000. By that time, KPMG had already issued the audited financial statements of Papel for 1997 and 1998. Cast Art does not claim that KPMG took any action with respect to those previously issued statements that could be found to satisfy the demanding requirements of N.J.S.A. 2A:53A-25(b)(2). Therefore, the question whether KPMG assumed a duty of care to Cast Art under the three-part test set forth in N.J.S.A. 2A:53A-25(b)(2) must focus upon the process of KPMG's preparation of the 1999 audited Papel financial statement and the issuance of that statement in September 2000.
The record contains substantial evidence that KPMG knew not only that Papel's audited 1999 financial statement would be made available to Cast Art but also that Cast Art would rely upon the statement and thus that issuance of the statement was a precondition of the proposed merger between Papel and Cast Art going forward. The president of Cast Art, Scott Sherman, testified that PNC Bank would not provide the financing required to complete the merger without an audited Papel financial statement. He also testified that there were one or more conference calls between Papel's management, Cast Art's management, and KPMG's representatives during which the need for the audited Papel financial statement was discussed. Although Sherman could not identify the KPMG representative or representatives *569 who participated in the conference calls or how many conference calls KPMG participated in, this uncertainty did not preclude the jury from crediting Sherman's testimony. Plaintiffs also presented testimony that Paul Lowry, a partner of KPMG who acted as an advisor to Papel in connection with the proposed merger, acquiesced in attachment of the 1999 KPMG audited Papel financial statement to the merger agreement between Papel and Cast Art. This evidence was sufficient to support the jury's findings that KPMG had a duty of care to plaintiffs under each of the three tests set forth in N.J.S.A. 2A:53A-25(b)(2).[2]
N.J.S.A. 2A:53A-25(b)(2)(a) requires a non-client asserting an accounting malpractice claim to show that the defendant accountant
[1] knew at the time of the engagement by the client, or [2] agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant[.]
[Emphasis and bracketed numbers added.]
In interpreting this subsection, the essential question is whether "at the time of engagement by the client" refers solely to the date on which the client retained the accountant's services or encompasses the entire period of performance of those services. If this phrase refers solely to the date of the accountant's initial retention, plaintiffs would have to show that KPMG "agreed with [Papel]" that its 1999 financial statement would be made available to Cast Art, because Papel retained KPMG on November 17, 1999, which was well before KPMG became aware of the proposed merger between Cast Art and Papel in the spring of 2000. However, if this phrase refers to the entire period of performance of KPMG's services until it issued the audited Papel financial statement in September 2000, plaintiffs would only have to show that KPMG "knew" that the audited 1999 financial statement would be made available to Cast Art in connection with the proposed merger.
The Code of Professional Conduct issued by the American Institute of Certified Public Accountants (AICPA) supports the conclusion that an accountant's "engagement" spans the entire period from when the engagement letter is signed to when an audit report is issued:

Period of the professional engagement. The period of the professional engagement begins when a member either signs an initial engagement letter or other agreement to perform attest services or begins to perform an attest engagement for a client, whichever is earlier. The period lasts for the entire duration of the professional relationship *570 ... and ends with ... the termination of the professional relationship or by the issuance of a report, whichever is later....
[AICPA, Code of Professional Conduct § 92.26 (2010) (emphasis added).]
This understanding of the meaning of an accountant's engagement by a client is also reflected by KPMG's "Completion Memorandum" for the audit of Papel's 1999 financial statement, which refers to the "wrap-up stage of the engagement."
KPMG argues that even if "engagement" or "time of the engagement" refers to the entire period of the accountant's performance of professional services, as the AICPA's Code of Professional Conduct indicates, N.J.S.A. 2A:53A-25(b)(2)(a) should be construed more restrictively to refer solely to the date on which the client retained the accountant because it refers to what the accountant knew "at the time of the engagement by the client," rather than "at the time of the engagement." We see no reason why the addition of the words "by the client" should result in such a significant change in the meaning of "at the time of the engagement." By definition, the client is the party who engages the accountant. Therefore, the addition of the words "by the client" cannot reasonably be construed to give the first clause of N.J.S.A. 2A:53A-25(b)(2)(a) a different meaning than it would have had if those words had been omitted.
KPMG also relies upon our statement in E. Dickerson & Son, Inc. v. Ernst & Young, LLP, 361 N.J.Super. 362, 368, 825 A.2d 585 (App.Div.2003), aff'd, 179 N.J. 500, 846 A.2d 1237 (2004), that "[u]nder subsection [ (a) ] of the statute, the accountant must know when engaged, or must thereafter agree with the client, that his work will be made available to a `specifically identified' claimant `in connection with a specified transaction made by the claimant,'" (emphasis added), as support for its argument that "at the time of the engagement" refers solely to the client's initial retention of the accountant rather than the entire period during which the accounting services are performed. However, the meaning of the phrase "at the time of the engagement" in N.J.S.A. 2A:53A-25(b)(2)(a) was not at issue in Dickerson, and "when engaged" could be construed to refer to the entire period during which an accountant performs a service for a client rather than just the time of initial retention.
The second question involved in determining whether plaintiffs satisfied the prerequisite of N.J.S.A. 2A:53A-25(b)(2)(a) for imposition of a duty of care upon KPMG is a factual question: whether plaintiffs presented sufficient evidence to support the jury finding that KPMG "knew ... that the professional accounting service rendered to the client [the 1999 audited Papel financial statement] would be made available to [Cast Art], who was specifically identified to [KPMG] in connection with a specified transaction made by [Cast Art,]" specifically its proposed merger with Papel. N.J.S.A. 2A:53A-25(b)(2)(a). Cast Art's president, Scott Sherman, testified that he participated in a conference call or calls in which a KPMG representative was told that Cast Art had to receive the audited financial statement in order for the merger to go forward. KPMG partner Paul Lowry testified that he reviewed a draft of the merger agreement, which indicated that the KPMG audited 1999 Papel financial statement would be attached. Moreover, KPMG's lead auditor in the 1999 Papel audit, John Quinn, acknowledged that KPMG knew while performing the audit that its report would be made available to Cast Art in connection with the proposed merger. Therefore, plaintiffs presented more than sufficient evidence *571 to establish that KPMG knew that its audit of Papel's 1999 financial statement would be "made available" to Cast Art in connection with its proposed merger with Papel and thus satisfied the prerequisite for imposition of duty of care to a non-client set forth in N.J.S.A. 2A:53A-25(b)(2)(a).[3]
KPMG does not dispute that the evidence was sufficient to satisfy the test set forth in N.J.S.A. 2A:53A-25(b)(2)(b),that KPMG "knew that [Cast Art and its principals] intended to rely upon [the 1999 audited financial statement] in connection with [the proposed merger with Papel]."
The same evidence that provided a sufficient foundation for finding that the tests set forth in N.J.S.A. 2A:53A-25(b)(2)(a) and (b) were satisfied also supports the finding that the test set forth in N.J.S.A. 2A:53A-25(b)(2)(c) was satisfied. There are several observations that need to be made about this subsection. First, it does not require the accountant to agree that a third-party claimant such as Cast Art will rely upon the accounting professional service. It only requires a showing of the accountant's "understanding" that there would be such reliance. Second, although that understanding must be "directly expressed to the claimant," this direct expression may take the form of either "words or conduct."
Sherman's testimony regarding the conference call or calls with a KPMG representative, and Lowry's review of the merger agreement, which indicated that the KPMG audited Papel financial statement would be attached, clearly provided a sufficient evidential foundation for a finding of KPMG's "understanding" that Cast Art would rely upon that statement in going forward with the merger. We also conclude that KPMG's "conduct" in issuing the financial statement with this understanding, and its acquiescence in the attachment of the statement to the merger agreement, constituted the required "direct expression" to Cast Art of KPMG's understanding of the "intended reliance" of Cast Art and its principals upon that statement.
KPMG places heavy reliance upon a letter executed by Cast Art on August 28, 2000, as a condition of obtaining access to KPMG's work papers relating to preparation of Papel's 1998 financial statement, under which Cast Art agreed "that it does not acquire any right as a result of such access that it would not otherwise have had." However, this letter related solely to those 1998 work papers. Cast Art did not execute any comparable document relating to the KPMG audited 1999 financial statement. Therefore, the August 28, 2000 access letter did not negate KPMG's understanding that the 1999 Papel financial *572 statement would be made available to and relied upon by Cast Art in connection with its proposed merger with Papel.

III.
KPMG argues that even if it owed Cast Art a duty of care under the Accountant Liability Act, plaintiffs failed to present sufficient evidence to support a finding that KPMG breached that duty. In particular, KPMG argues that plaintiffs failed to establish the materiality of the misstatements in the 1999 KPMG audited Papel financial statement.
In conducting an audit, an accountant is required to follow generally accepted accounting principles (GAAP) and generally accepted auditing standards (GAAS). See NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 380, 901 A.2d 871 (2006); Rosenblum, supra, 93 N.J. at 342-43, 461 A.2d 138. However, these principles and standards are general in nature, and their application in the conduct of any particular audit requires the exercise of professional judgment. Thus, one section of the GAAS states:
The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.
[AICPA, Codification of Statements on Auditing Standards (AU) § 150.02, Generally Accepted Auditing Standards (2009).]
In a similar vein, the Court in Rosenblum explained:
To perform these functions [under GAAS] the auditor must, among other things, familiarize himself with the business, its operation and reporting methods and industry-wide conditions. It is necessary to understand the financial and accounting characteristics and practices of the enterprise. In short, the auditor must be so knowledgeable that he can render an "informed opinion."
....
... The auditor should exercise reasonable care in verifying the underlying data and examining the methodology employed in preparing the financial statements. The accountant must determine whether there are suspicious circumstances and, even in the absence of suspicious circumstances, make a reasonable sampling or apply some testing technique.
[93 N.J. at 343-44, 461 A.2d 138.]
Because the conduct of an audit involves the exercise of professional judgment, a claim that an auditor has committed malpractice by failing to exercise due care ordinarily must be supported by appropriate expert testimony. See Seaward Int'l, Inc. v. Price Waterhouse, 239 Va. 585, 391 S.E.2d 283, 287 (1990).
As a foundation for the opinions of their forensic accountant, plaintiffs presented substantial evidence, much of it in the form of testimony by former Papel employees, concerning systemic, organized, improper accounting practices at Papel during the years preceding the merger. The essential objective of these practices was to prematurely report revenue in Papel's quarterly statements, which actually represented sales in the following quarter, in order to comply with the debt covenants in Papel's loan agreements with banks to which it owed substantial amounts of money. One practice used by Papel was referred to as the "dotting scheme," under which Papel would book a purchase order as a sale, but rather than ship the goods immediately, box them and place them into shipping containers on its property. *573 Under another improper accounting practice, referred to as the "groundhog day scheme," Papel would not recognize the quarter's end date, which resulted in invoices being recorded as of the end of the quarter even though the orders were not shipped until significantly later in the following quarter. There also was at least one instance in which Papel created a phantom order in the amount of approximately $121,000 when in fact no order had been placed or goods sold.
Although KPMG was not aware of the full scope of Papel's improper accounting practices, it became aware in auditing Papel's financial statement for the quarter ending September 30, 1997, that Papel had prematurely recorded approximately 4,800 sales totalling over $731,000 as occurring on the last few days of that quarter, which actually were not made until the following quarter. After making this discovery, KPMG performed spot-testing of invoices for sales late in the preceding quarter ending June 30, 1997, which also revealed premature recording of revenue.
KPMG's partner responsible for managing the audit spoke to Papel's Chief Financial Officer, Rick Wasserman, about this problem, and Wasserman "committed to ensure it did not recur." A KPMG work paper relating to the audit of Papel's 1997 third quarter financial report stated:
[T]here appears to be a shipping cutoff problem. KPMG will perform thorough cutoff testing at year end.
Plaintiffs' forensic accounting expert, Henry Stotsenberg, testified that, in light of KPMG's discovery of substantial premature recording of revenue in its audit of Papel's third quarter 1997 financial statement, KPMG had an obligation in its future audits of Papel to obtain reasonable assurance that this improper accounting practice had been terminated. Stotsenberg expressed the opinion that KPMG failed to exercise such due care in its audits of Papel's financial statements for 1997, 1998 and 1999. Regarding the 1997 audit, Stotsenberg testified:
If you recall the test work that was done in 1997, they uncovered approximately six thousand invoices that were improperly recorded as revenue.
To then test only 24, let's say, invoices at the end of the year, I would not consider that thorough. It's my opinion that they would have to test until KPMG was satisfied that no fraud existed. And, in my opinion, testing for 24 invoices does notdoes not cut it.
Also, at the end of the year testing KPMG failed to look at shipping documents, that is, third party shipping documents, such as Bills of Lading, the accounts payable for UPS, RPS, Fed Ex, to verify from independent third party sources when that merchandise was shipped.
Regarding the 1998 audit, Stotsenberg testified:
Again, based upon what they uncovered in September of 1997, in my opinion, KPMG had a duty to test until KPMG was satisfied there was no fraud.
They did not do sufficient testing.
In addition, of the tests that KPMG did make, KPMG found an error rate of roughly 43 percent to 50 percent of all the invoices they tested, which further indicates that there's something wrong. And they did not follow up on that error rate to determine what was wrong.
Regarding the 1999 audit, when asked why he believed KPMG did not "get it right," Stotsenberg testified:
For the same reasons I gave for the 1998 cutoff testing and the 1997 cutoff testing. They did not look at sufficient invoices or test for sufficient invoices to *574 satisfy the question of whether or not fraud exists.
In addition, of the invoices they did test, there was an error rate of about, roughly, 35 to 43 percent, which, again, suggests that something is wrong.
They did not follow up on the results of that test.
Stotsenberg further testified that when the KPMG auditors identified discrepancies in Papel's financial records, KPMG improperly acquiesced in Papel's requests to consider those discrepancies immaterial and allow inclusion of the revenue reflected in those records in its financial statements even though this violated generally accepted accounting principles.
Stotsenberg also noted that KPMG's files regarding the 1999 audit of Papel included a letter from John Quinn, KPMG's partner in charge of the audit team, to KPMG partner, Frank Casal, dated July 21, 2000, which stated:
In light of our experience in this and prior years, Rick Wasserman's unfair and misleading characterization of the accounting and auditing issues and the performance of the engagement team this year, I am very much inclined to recommend that we re-evaluate our client relationship at the conclusion of this year's audit and consider whether we wish to continue to do business with Papel and its principals.
Stotsenberg expressed the opinion that once KPMG concluded that Papel's chief financial officer was not trustworthy, it should have withdrawn from its audit of Papel and not issued the 1999 financial statement upon which plaintiffs' claims were primarily based.
KPMG did not present any expert opinion testimony to dispute Stotsenberg's conclusions regarding KPMG's negligence in the conduct of the 1997, 1998 and 1999 Papel audits. Nevertheless, KPMG argues that plaintiffs did not present sufficient evidence of KPMG's breach of its duty of care because they did not present evidence that Papel's financial statements contained "material" misstatements. Specifically, KPMG contends that plaintiffs did not present evidence, either through Stotsenberg's testimony or any other source, that quantified the extent of Papel's overreporting of revenue as a result of its improper accounting practices.
Plaintiffs contend that misstatements in a financial statement may be material even without quantification, which plaintiffs characterize as "qualitatively material misstatements." This position was supported by the testimony of Stotsenberg, who stated:
Materiality is not about the size of the number or the smallness of the number. It's the qualitative aspects of the misstatements. There's a qualitative factor that you have to consider.
....
An amount may be very small, but it may be indicative of a fraud. So, therefore, it's material.
....
So if you have audit evidence or information that there's an indication that smaller amounts may be indicative of a fraud, then it's very material.
Stotsenberg also testified that Papel's improper accounting practices were fraudulent and that KPMG would have detected that fraud if it had exercised due care in its audits of Papel.
The conclusion that misstatements in a financial statement may be found to be material even without quantification is supported by the AICPA's auditing standards. One such auditing standard states: "[M]ateriality is a matter of professional judgment.... [M]ateriality judgments are *575 made in light of surrounding circumstances and necessarily involve both quantitative and qualitative considerations." AICPA, AU § 312.04, Audit Risk and Materiality in Conducting an Audit (2009). In the same vein, the Second Circuit Court of Appeals has observed, quoting a Securities and Exchange Commission staff bulletin, "that various `qualitative factors may cause misstatements of qualitatively small amounts to be material.'" Ganino v. Citizens Utils. Co., 228 F.3d 154, 163 (2d Cir. 2000) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150, 45152 (1999)); see also Restatement (Second) of Torts § 538(2)(a) (1976) (stating that a misrepresentation "is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question"). Consistent with these authorities, we conclude plaintiffs were not required to quantify the extent of Papel's premature recognition of revenue in order to show that the misstatements in its financial statements were material.
Furthermore, even though Stotsenberg did not quantify Papel's overreporting of revenue by means of premature revenue recognition, plaintiffs presented other evidence from which the jury could reasonably have inferred that the overreporting was substantial. This evidence included testimony by former Papel employees concerning the pervasiveness and magnitude of Papel's improper accounting practices and Sherman's testimony that Cast Art discovered massive fraud in Papel's former operations after the merger. Thus, plaintiffs presented evidence of both a qualitative and quantitative nature regarding the materiality of the misstatements in Papel's KPMG audited financial statements.
Therefore, plaintiffs presented sufficient evidence to support the jury's finding that KPMG breached its duty of care.

IV.
KPMG argues that even if plaintiffs presented sufficient evidence to support a finding that KPMG breached its duty of care to them, they failed to present sufficient evidence that the breach was a proximate cause of Cast Art's failure after its merger with Papel.[4]
Our Supreme Court has held that "[g]enerally, our concepts of causation for failure to act are expressed in terms of whether the negligent conduct may be considered a substantial factor contributing to the loss." Conklin v. Hannoch Weisman, 145 N.J. 395, 419, 678 A.2d 1060 (1996). "The substantial factor test accounts for the fact that there can be any number of intervening causes between the initial wrongful act and the final injurious consequence and does not require an unsevered connecting link between the negligent conduct and the ultimate harm." Id. at 420, 678 A.2d 1060. The Court has indicated that "[this] test is thus suited for legal malpractice cases in which inadequate or inaccurate legal advice is alleged to be a concurrent cause of harm." Ibid.
This test is equally well suited to this kind of accounting malpractice case, in which plaintiffs claimed that KPMG negligently failed to discover and/or to report that Papel had engaged in the improper accounting practice of prematurely reporting revenue, as a result of which plaintiffs went forward with a merger that caused Cast Art's financial failure. In a case involving this kind of an accounting malpractice claim, as in a case involving the kind of legal malpractice claim asserted in Conklin, *576 "there can be any number of intervening causes between the initial wrongful act and the final injurious consequence." Ibid. Consequently, plaintiffs should not be required to show "an unsevered connecting link between the negligent conduct and the ultimate harm." Ibid.
We reject KPMG's argument that the test for determining the required proximate causal relationship between its malpractice and plaintiffs' claimed loss as a result of that malpractice is not the "substantial factor" test set forth in Conklin but rather the "loss causation" test set forth in McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425 (3d Cir.2007). The primary claim in McCabe was a claim under section 10(b) of the Securities Exchange Act, which has been interpreted to require a showing of "loss causation" as one element of such a cause of action. See id. at 424. Nothing in Conklin suggests that our Supreme Court would apply this federal securities fraud causation test to a common law claim for accounting malpractice. Indeed, the Court has refused to apply decisional law under section 10(b) to other issues raised in an accounting malpractice action. See NCP Litig. Trust, supra, 187 N.J. at 384, 901 A.2d 871. Therefore, the proximate causation issue in this appeal must be determined under the Conklin "substantial factor" test.[5]
In this case, there were unquestionably intervening market forces and management decisions during the more than two-year period between the merger of Papel and Cast Art and Cast Art's failure that contributed to that failure. However, under the Conklin proximate cause test, such other contributing causes do not insulate KPMG from liability for Cast Art's failure if the evidence was sufficient to support a finding that KPMG's malpractice "was a substantial factor in causing [the failure]." Conklin, supra, 145 N.J. at 420, 678 A.2d 1060.
Plaintiffs showed, primarily through the testimony of Papel's former employees, that Papel engaged in a pervasive scheme of premature reporting of revenue beginning in 1997 and continuing until Cast Art entered into the merger agreement with Papel in the fall of 2000. Plaintiffs showed, primarily through the testimony of Cast Art's President, Scott Sherman, that Cast Art would not have merged with Papel if it had been advised, as a result of a properly conducted audit by KPMG, of Papel's premature reporting of revenue and consequent inaccurate financial statements. Plaintiffs also showed through Sherman's testimony that Cast Art was a profitable business with virtually no debt before it merged with Papel. In addition, Sherman testified that the financial problems Cast Art experienced after the merger resulted primarily from the "cash crunch" caused by the disparity between Papel's actual accounts receivables and what Cast Art reasonably expected those accounts receivables to be based on Papel's pre-merger financial statements. This evidence was sufficient to support a finding that KPMG's negligence in auditing Papel's financial statements, which Cast Art relied upon in proceeding with the merger, was a substantial factor in Cast Art's financial failure.
We reject KPMG's argument that the testimony of an outside expert was required to provide a sufficient foundation for this finding. As Cast Art's president both before and after the merger, Sherman was extremely knowledgeable about *577 the giftware business generally and Cast Art's business operations specifically. Indeed, it is doubtful whether any outside expert could have obtained comparable knowledge of Cast Art's business operations and the cause or causes of its financial collapse after the merger.
A party to an action with expertise gained through such personal experience may express an opinion of the sort ordinarily provided by an expert. See Carey v. Lovett, 132 N.J. 44, 64, 622 A.2d 1279 (1993). We are satisfied that Sherman's opinions regarding the cause of Cast Art's financial failure were properly admitted. It is true that Sherman, as a party in the case, had an obvious bias. However, this bias was simply a factor for the jury's consideration in weighing the credibility of Sherman's testimony. It is not a basis for concluding that Sherman's testimony, together with the other evidence presented by plaintiffs, provided an insufficient evidential foundation for the jury's finding that KPMG's malpractice was a substantial factor in Cast Art's failure.

V.
KPMG presents a series of arguments regarding the trial court's jury instructions.

A.
KPMG argues that the court incorrectly instructed the jury regarding the "justifiable reliance" element of plaintiffs' negligent misrepresentation claim. See Kaufman v. i-Stat Corp., 165 N.J. 94, 109, 754 A.2d 1188 (2000).
Plaintiffs asserted claims of both negligent misrepresentation and accounting malpractice. The court's instruction regarding "justifiable reliance" related solely to plaintiffs' negligent misrepresentation claim. KPMG does not argue that such reliance is also an element of a claim for accounting malpractice and that the trial court thus erred in failing to so instruct the jury. Therefore, even if the court had erroneously instructed the jury regarding this element of negligent misrepresentation, we see no basis for concluding that such error could have infected the jury's consideration of plaintiffs' accounting malpractice claim and for that reason require a reversal of the jury's verdict in plaintiffs' favor based on that claim.
In any event, we find no reversible error in the court's instruction regarding justifiable reliance, which reads as follows:
If you find that Plaintiffs did rely on KPMG's negligent misrepresentation, you must decide whether you believe that this decision was justified.
In other words, would a reasonable person or business consider the facts or professional opinions which were represented to be important in reaching a decision as to which to proceed with the proposed merger?
Even if you don't find that, if the misrepresentation might not have been something that most people would consider important, but if KPMG knew that the Plaintiffs would rely on their representation, their negligent misrepresentation, reliance may be justified.
If you find, in other words, that KPMG's audits were a substantial factor in that decision, you must then determine whether that reliance was legally justified.
If you conclude that Plaintiffs did not rely on KPMG's audits, your verdict must be for KPMG.
If you find that KPMG was negligent and the Plaintiffs actually relied on the audits, you have to determine, as I *578 said, whether Plaintiff[s'] reliance was justified.
Would a reasonable person consider the audit contents important in reaching a decision on the underlying merger?
The Plaintiffs could not have justifiably relied on KPMG's negligent misrepresentation if they conducted their own independent investigation into Papel's financial condition by examining the same data, in the same fashion, for the same purposes.
If Plaintiffs chose to do their own investigation, they will be deemed to have relied on that investigation and will be charged with knowledge of whatever it discovered or could have discovered reasonably.
If, however, you find that the Plaintiffs conducted an investigation peripheral to the representations of KPMG, not directly related to the representations of KPMG, you may find that Plaintiff[s'] reliance on KPMG's audits was justified.
In analyzing this issue and in determining whether the evidence showed that the Plaintiffs justifiably relied on KPMG's audits consider whether Plaintiffs decided not to rely on those audits but decided instead to conduct its own independent audit of Papel.
The mere fact that Plaintiffs did research into Papel's financial affairs does not negate reliance unless in your mind the research amounted to something equal to an audit, involving the same data, for the same purposes, in the same fashion.
There is no evidence in this case that the due diligence investigation was the same as an audit.
If you conclude that Plaintiffs justifiably relied on KPMG's audit opinion, you will then go down to the next question.
[Emphasis added.]
KPMG contends that the trial court erred in informing the jury that "[t]here is no evidence in this case that the due diligence investigation was the same as an audit." However, we are satisfied from our review of the record that this was an accurate statement of the evidence presented at trial. In fact, numerous KPMG witnesses described the significant differences between a due diligence investigation and an audit conducted in accordance with generally accepted auditing standards.
KPMG also contends that the court erred in instructing the jury that plaintiffs' due diligence investigation could negate plaintiffs' justifiable reliance upon the KPMG audit only if that investigation "amounted to something equal to an audit, involving the same data, for the same purposes, in the same fashion." We question whether this degree of similarity between plaintiffs' due diligence investigation and the KPMG audit would be required to negate plaintiffs' claimed justifiable reliance upon the audit.
However, KPMG presented only extremely weak evidence in support of its claim that plaintiffs could not be found to have justifiably relied upon the KPMG audit because its due diligence investigation revealed the same information concerning Papel's financial condition and business operations that a properly conducted audit would have revealed. The consultants who performed the due diligence investigation testified that they did not themselves perform an audit of Papel's financial statements but instead relied upon KPMG's audit in advising Cast Art concerning the proposed merger. To be sure, some of those consultants raised concerns about Papel's financial condition. But those concerns were not directed at the accuracy of *579 Papel's financial statements, which an audit is designed to determine, but instead assumed the accuracy of those statements and raised other concerns about Papel. Consequently, even though plaintiffs relied upon their consultants' advice in determining to proceed with the merger, there is no evidence they relied upon that advice to verify the accuracy of Papel's financial statements, and for that reason, as well as the fact that justifiable reliance was not an element of plaintiffs' accounting malpractice claim, any error in the court's instruction regarding the justifiable reliance element of negligent misrepresentation was harmless.

B.
KPMG also argues that the trial court's jury instruction regarding plaintiffs' alleged comparative negligence was erroneous. That instruction was:
Defendants contend that the Plaintiffs themselves were negligent, did not conform to a standard.
....
Negligence is the failure to act with reasonable care.
Obviously, the Plaintiffs have no responsibility to audit a financial statement. That's not their business. That's not their role.
But KPMG claims that Plaintiffs contributed to their own losses.
KPMG claims that the Plaintiffs acted negligently and unreasonably in proceeding with the merger for reasons having nothing to do with KPMG's audit.
If KPMG proved this, that means that both the Plaintiffs and KPMG were negligent.
In a footnote, KPMG objects to the part of this instruction which informed the jury: "Obviously, the [p]laintiffs have no responsibility to audit a financial statement. That's not their business. That's not their role." KPMG did not raise this objection at trial. In any event, the objection is clearly without merit. The part of the court's instruction to which KPMG now objects simply informed the jury, consistent with KPMG's own theory of the case,[6] that plaintiffs' alleged negligence did not consist of their failure to conduct their own audit but rather their "negligently and unreasonably... proceeding with the merger for reasons having nothing to do with KPMG's audit."

C.
KPMG argues that the trial court erroneously instructed the jury that KPMG owed a greater standard of care in conducting the audit of Papel than the standard established by GAAS based on its own internal training materials. The trial court gave the jury the following instruction regarding the standard of care applicable to KPMG's audit of Papel:
Plaintiffs in this case contend that KPMG did not comply with the standard of care imposed upon it by law in connection with the 1998, 1999 audits of Papel, and as a result Plaintiff suffered losses.
Therefore, you must understand the standard of care by which KPMG's conduct as an auditor must be monitored.
An accounting firm which performs audits of financial statements represents that it possesses that degree of knowledge and skill ordinarily possessed and used by other accountants and auditors *580 in connection with the auditing of financial statements.
The law imposes on KPMG the duty to have and to use that degree of knowledge and skill that accountants of ordinary ability and skill possess and exercise in auditing financial statements for its client.
And the client here was Papel.
The required knowledge and skill of the auditor must be judged by the standard auditing practice at the time that the audit was performed.
You have heard evidence about a set of standards called generally accepted auditing standards, GAAS, established by the auditing industry as the standard of care for audits.
You have also heard other evidence relating to internal auditing standards which were in effect at KPMG, as well as evidence from the testimony of KPMG auditors, who testified here in one form or another, as to the standard of auditing practice.
Give all of this evidence the weight that you think it deserves.
Financial statements are prepared and published by the auditor's client. Here Papel is the client. And Papel has the responsibility for their contents.
A financial statementand you've heard reference to balance sheets and income statements, and maybe profit and loss statements might have been mentioned also. Those financial statements present a snapshot of a company's financial position as of a certain date.
A company is obligated to record and present transactions in the financial statements in accordance with standards which you also heard about, generally accepted accounting principles. GAAP.... In conducting its audit the auditor must follow generally accepted accounting standards, GAAS, as well as internal firm standards.

GAAS requires that an auditor provide only reasonable but not absolute assurance against a material misstatement in financial statements.
Professional standards do not establish numerical criteria for materiality in terms of a specific percentage or amount.
The auditor neither assumes that management is dishonest [n]or assumes unquestioned honesty. The auditor recognizes conditions observed and the evidence obtained during its current and past audits and evaluates that information objectively.
Unless the auditor's examination reveals evidence requiring further investigation, the auditor's reliance on the truthfulness of management's representation and on the genuineness of records and documents obtained during the examin[ation] is reasonable.
[Emphasis added.]
Considered in isolation, the court's instruction that, "[i]n conducting its audit the auditor must follow generally accepted accounting standards, GAAS, as well as internal firm standards," (emphasis added), was erroneous. However, we conclude this error was harmless.
A defendant's "internal policiesstanding alonecannot demonstrate the applicable standard of care." Briggs v. Wash. Metro. Area Transit Auth., 481 F.3d 839, 848 (D.C.Cir.2007). Therefore, "[w]hile a defendant's internal rules may be admissible as evidence of whether reasonable care was exercised, such rules must be excluded, as a matter of law, if they require a standard of care which transcends the traditional common-law standard *581 of reasonable care under the circumstances." Branham v. Loews Orpheum Cinemas, Inc., 31 A.D.3d 319, 819 N.Y.S.2d 250, 255 (App.Div.2006); accord Wal-Mart Stores, Inc. v. Wright, 774 N.E.2d 891, 894-95 (Ind.2002); see also Johnson v. Mountainside Hosp., 239 N.J.Super. 312, 322-24, 571 A.2d 318 (App. Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990).
These principles are fully applicable to an accounting malpractice claim. If auditors could be exposed to heightened liability for developing and adhering to training materials or other internal policies that provided for a higher standard of care than GAAS, this could both discourage accounting firms such as KPMG from training professionals to exceed minimum standards and create a patchwork quilt of standards of care for each accounting firm depending upon its own internal standards. Consequently, if plaintiffs had presented evidence of a standard of care in the KPMG training materials that exceeded what is required by GAAS, and sought to impose liability upon KPMG for a deviation from that higher standard, the court's erroneous instruction regarding those training materials would have required a reversal of the verdict in plaintiffs' favor.
However, plaintiffs did not identify any standard of care in KPMG's training materials that went beyond what is required by GAAS. To the contrary, plaintiffs' expert, Stotsenberg, repeatedly indicated that the standards set forth in those training materials were consistent with GAAS and that he agreed with them. Thus, plaintiffs presented those training materials to the jury solely as an illustration of KPMG's recognition and application of GAAS rather than as evidence that KPMG had adopted higher standards for its audits than are required by GAAS. Under these circumstances, the error in the court's instructions regarding the jury's consideration of those training materials was harmless.

VI.
KPMG argues that the trial court erred in allowing the jury to award plaintiffs the value of Cast Art as of the day of the merger as damages, on the ground that KPMG's accounting malpractice caused Cast Art to go forward with the merger, which resulted in its financial failure and thus the loss of its entire value at the time of the merger. In the alternative, KPMG argues that even if Cast Art's value as of the time of the merger was a proper measure of damages, plaintiffs failed to present competent evidence to support the jury's award. We conclude that Cast Art's value on the day of merger was an appropriate measure of plaintiffs' damages, but that plaintiffs' proofs did not support the jury's determination of that value.

A.
There is no single formula for determining the appropriate measure of an injured party's damages. See 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254-55, 168 A.2d 33 (1961). The injured party is only required "to provide for the jury some evidentiary and logical basis for calculating or, at least, rationally estimating a compensatory award." Caldwell v. Haynes, 136 N.J. 422, 436, 643 A.2d 564 (1994) (quoting Huddell v. Levin, 537 F.2d 726, 743 (3d Cir.1976)). The appropriate measure of damages depends on the nature of the harm established by the injured party. See 525 Main St., supra, 34 N.J. at 254-55, 168 A.2d 33.
Plaintiffs did not claim that KPMG's malpractice in auditing Papel's financial statements caused them to allocate a greater percentage of the shares of the merged company to Papel's shareholders than if the audit had portrayed an accurate picture of Papel's financial condition or *582 resulted in the merged company realizing lower profits than had been anticipated based on Papel's financial statements. Instead, plaintiffs' claim was that KPMG's malpractice caused them to enter into a merger agreement they would not have entered into if they had obtained an accurate picture of Papel's financial condition based on a properly performed audit and that the merger caused Cast Art's financial failure several years later.
The jury credited the evidence plaintiffs presented in support of this claim, and we have concluded for the reasons previously set forth that there was sufficient evidence to support the jury's findings in plaintiffs' favor. Based on those findings, we conclude that the value of Cast Art on the day of the merger was an appropriate measure of plaintiffs' damages because the harm plaintiffs suffered as a result of KPMG's malpractice was the financial failure and consequent loss of all value of Cast Art.
This conclusion is supported by decisions in other jurisdictions, which have recognized that even though lost profits may be the most common measure of damages in business tort cases, the value of a destroyed business enterprise is a more appropriate measure if the evidence supports a finding that defendant's wrongful conduct was a substantial factor in that destruction. See, e.g., Mattingly, Inc. v. Beatrice Foods Co., 835 F.2d 1547, 1559-60 (10th Cir.1987), vacated due to settlement, 852 F.2d 516 (10th Cir.1988); Int'l Indem. Co. v. Reg'l Employer Serv., Inc., 239 Ga. App. 420, 520 S.E.2d 533, 536, cert. denied, No. S99C1734, 1999 Ga. LEXIS 1019 (Ga. Nov. 19, 1999); Wagenheim v. Alexander Grant & Co., 19 Ohio App.3d 7, 482 N.E.2d 955, 967 (1983); Lively v. Rufus, 207 W.Va. 436, 533 S.E.2d 662, 667-69 (2000).

B.
We turn next to KPMG's argument that plaintiffs failed to present sufficient competent evidence of Cast Art's value as of the date of the merger, which was December 4, 2000, to support the jury's verdict. Plaintiffs retained a business valuation expert who KPMG deposed before trial. However, plaintiffs failed to present this expert's testimony at trial. Instead, plaintiffs relied upon three other forms of evidence to establish Cast Art's value at the time of the merger: (1) the deposition testimony of Cast Art's investment banking consultant, Richard Anderson, excerpts of which were read to the jury; (2) the trial testimony of Cast Art's president, Scott Sherman; and (3) a report prepared by Robert McMahon, a partner of KPMG, which was admitted into evidence, although McMahon did not testify. We conclude that this evidence did not establish a sufficient foundation for the jury's damages award and therefore there must be a new trial on damages.
Anderson was an investment banker who advised Cast Art in connection with its merger with Papel. Plaintiffs did not identify Anderson as a valuation expert before trial, and Anderson did not value Cast Art as of the date of the merger. Anderson only valued Cast Art and Papel as of a date nearly a year before the merger in order to determine the respective percentages of the merged company to be allocated to the Cast Art and Papel shareholders. For this purpose, it was irrelevant whether the combined companies were valued at $38.5 million, as Cast Art and Papel agreed, or a substantially higher or lower amount, so long as each of the companies was valued in the same manner in order to achieve a fair allocation of the shares of the merged company between the former shareholders of Cast Art and Papel. Thus, in the valuation process in which Anderson participated, the companies were valued at seven times their earnings before interest, taxes, depreciation, *583 and amortization (EBITDA), subject to certain adjustments, even though Anderson expressed the opinion that a multiple as low as four times EBITDA could appropriately have been used.
Furthermore, Anderson testified that the valuations of the companies used for the purpose of the merger were not the product of his own independent valuation but rather reflected "a negotiation ... between the advisors to both companies." Anderson indicated that in these negotiations "[t]he [Papel] shareholders ... wanted to incorporate ... as high a value as possible in the transaction structure." Anderson's testimony also suggests that the valuations of the companies were influenced by tax considerations and the parties' efforts to secure the financing needed to complete the merger. Thus, the valuations of the companies for the purpose of the merger between Cast Art and Papel were totally different from a sales price established by arms-length negotiation where one business buys another business for cash. Under these circumstances, the valuation in which Anderson participated did not provide a reliable foundation for determining Cast Art's true market value as of the date of the merger.
Plaintiffs also failed to identify Sherman as a valuation expert before trial and made no effort to establish his qualifications to value Cast Art. Moreover, even assuming Sherman would have been qualified to value Cast Art, he did not in fact undertake to make an independent valuation of the company. Instead, Sherman simply adopted the $38.5 million valuation that the parties had agreed to use for the purpose of the merger. Therefore, plaintiffs' reliance upon Sherman's testimony regarding this figure suffers from the same fatal deficiencies as their reliance upon Anderson's testimony.
Like Anderson and Sherman, McMahon was not identified as an expert valuation witness before trial and, except for his identification as "the partner in charge of the valuation practice at KPMG Consulting," the record does not disclose his qualifications. Furthermore, his report did not purport to establish the actual market value of Cast Art. Indeed, the letter transmitting the report stated: "We understand our study is to be used for corporate planning and tax reporting purposes, and no other use of our report or opinion is intended or should be inferred."
In any event, even assuming the admissibility of McMahon's valuation, it does not support the jury's damages award. McMahon valued the merged company at $28.5 million, which would mean that, under the 81%-19% allocation of the values of the two companies agreed upon by Cast Art and Papel in the merger agreement, Cast Art's part of the company would be worth approximately $23 million. However, the jury returned a verdict of $31.8 million, which was nearly $9 million more than this valuation. We of course have no way of knowing how the jury arrived at this award,[7] but it is clear the McMahon valuation, even assuming its admissibility, does not provide an adequate evidential foundation for it. Therefore, the damages award returned by the jury is not supported by the record, and for this reason, there must be a new trial on damages.

*584 VII.
Plaintiffs argue in their cross-appeal that the trial court erred in dismissing their claims for fraud and punitive damages and in denying their motions for leave to amend their complaint to assert claims for recklessness and aiding and abetting fraud. Plaintiffs characterize their cross-appeal as conditional; that is, plaintiffs seek to pursue the cross-appeal only if we reverse or modify the judgment under appeal. We have affirmed the judgment in plaintiffs' favor on liability. However, we have reversed the damages award and remanded for a new trial on damages. We do not discern any basis upon which plaintiffs' fraud, recklessness, and aiding and abetting fraud claims could support a greater award of compensatory damages than the malpractice and negligent misrepresentation claims the jury decided in plaintiffs' favor, which we have now affirmed. However, those claims could support an award of punitive damages. Consequently, in light of the reversal of the damages award, we assume the intent of plaintiffs' conditional cross-appeal would be for us to decide the viability of those claims.
We affirm the dismissal of plaintiffs' claims for fraud and punitive damages substantially for the reasons set forth in Judge Currier's July 23, 2008 written opinion and Judge LeBlon's May 5, 2004 letter opinion. We affirm the dismissal of plaintiffs' motion to amend their complaint to assert a claim for recklessness and seek punitive damages based on that recklessness substantially for the reasons set forth in Judge Currier's April 28, 2008 and May 23, 2008 oral opinions. We affirm the denial of plaintiffs' mid-trial motion to assert a claim for aiding and abetting fraud substantially for the reasons set forth in Judge Paley's September 29, 2008 oral opinion.[8] Plaintiffs' arguments in support of their cross-appeal do not warrant any additional discussion. R. 2:11-3(e)(1)(E).
Accordingly, we affirm the judgment on liability in plaintiffs' favor. We also affirm the dismissal of plaintiffs' fraud and punitive damages claims and the denial of their motions to assert claims for recklessness and aiding and abetting fraud. We reverse the damages award in plaintiffs' favor and remand the case for a new trial on damages only.
NOTES
[1] That reduction is not at issue in this appeal.
[2] The amici curiae argue that the trial court erred in submitting the question of whether KPMG owed a duty of care to Cast Art to the jury rather than deciding the question itself. However, KPMG did not raise this issue; indeed, KPMG appears to have acquiesced in the submission of the question of KPMG's duty of care to Cast Art to the jury. "[A]n amicus curiae must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties." Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49, 449 A.2d 1254 (1982). Therefore, the issue is not properly before us. In any event, it is difficult to see how KPMG could benefit from a conclusion that the question whether KPMG owed a duty of care to Cast Art should have been decided by the trial court rather than the jury, because the court indicated in denying KPMG's motion for a judgment notwithstanding the verdict or new trial that it would have decided this question the same way as the jury.
[3] Because we have concluded that the phrase "knew at the time of the engagement by the client" refers to the entire period of the performance of services for the client, and that the evidence supports the jury's finding that KPMG knew during this period that its audit of Papel's 1999 financial statement would be provided to Cast Art in connection with the proposed merger, there is no need to consider plaintiffs' alternative argument that even if the "time of the engagement" in N.J.S.A. 2A:53A-25(b)(2)(a) refers solely to the time of initial retention of the accountant, there is sufficient evidence in the record to support a finding that KPMG "agreed with [Papel] after the time of engagement" to make the 1999 Papel financial statement available to Cast Art in connection with the merger. However, we note that this issue was not presented to the jury. Therefore, even assuming the sufficiency of the evidence to support a finding in plaintiffs' favor on this issue, if our interpretation of the first clause of N.J.S.A. 2A:53A-25(b)(2)(a) were erroneous, the jury's liability verdict could not be sustained on that basis. Instead, there would have to be a reversal and remand for a new trial.
[4] KPMG only challenges the sufficiency of evidence to support the required finding of proximate cause. It does not challenge the jury instruction regarding this issue.
[5] Because we conclude that this case is not governed by the "loss causation" test, we have no occasion to consider how, if at all, that test differs from the "substantial factor" test. See McCabe, supra, 494 F.3d at 438-39.
[6] In his summation, KPMG's counsel argued:

KPMG has asserted, and we submit has proven, that Plaintiffs were negligent and acted unreasonably in proceeding with the merger for reasons unrelated to KPMG's audit opinions.
[7] We note that plaintiffs' counsel argued at one point in summation, referring to the McMahon report, that "KPMG itself valued the entity at $28 and a half million." Although plaintiffs' counsel later corrected himself and stated that only 81% of McMahon's valuation was attributable to Cast Art, the jury may not have understood this correction and consequently awarded plaintiffs the full $28.5 million. Plaintiffs' counsel also urged the jury to award the loss of Sherman's $3.3 million guarantee of the PNC loan as additional damages. Therefore, the jury's verdict of $31.8 million very well may have been arrived at by combining McMahon's $28.5 million valuation of the merged Cast Art and Papel entity plus the amount of the Sherman guarantee. In addition to the absence of any evidential support for a $28.5 million valuation of Cast Art on the date of the merger, plaintiffs have not provided any rationale for awarding plaintiffs $3.3 million more than the value of Cast Art based on Sherman's guarantee.
[8] We note that Judge Paley's opinion also reaffirmed the pretrial dismissal of plaintiffs' fraud and punitive damages claims in light of the evidence presented at trial.